Dale HACKBART, Plaintiff-Appellant,

v.

CINCINNATI BENGALS, INC., and
Charles "Booby" Clark,
Defendants-Appellees.

No. 77–1812.

United States Court of Appeals,
Tenth Circuit.

Argued March 13, 1979.

Decided June 11, 1979.

Mary Butler, of Johnson & Mahoney, P. C., Denver, Colo. (Roger F. Johnson, Denver, Colo., on brief), for plaintiff-appellant.

Robert G. Stachler, of Taft, Stettinius & Hollister, Cincinnati, Ohio (William C. McClearn, of Holland & Hart, Denver, Colo., and Thomas T. Terp, of Taft, Stettinius & Hollister, Cincinnati, Ohio, on brief), for defendants-appellees.

Before DOYLE, McKAY and LOGAN, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

The question in this case is whether in a regular season professional football game an injury which is inflicted by one professional football player on an opposing player can give rise to liability in tort where the injury was inflicted by the intentional striking of a blow during the game.

The injury occurred in the course of a game between the Denver Broncos and the Cincinnati Bengals, which game was being played in Denver in 1973. The Broncos' defensive back, Dale Hackbart, was the recipient of the injury and the Bengals' offensive back, Charles "Booby" Clark, inflicted the blow which produced it.

By agreement the liability question was determined by the United States District Court for the District of Colorado without a jury. The judge resolved the liability issue in favor of the Cincinnati team and Charles Clark. Consistent with this result, final judgment was entered for Cincinnati and the appeal challenges this judgment. In essence the trial court's reasons for rejecting plaintiff's claim were that professional football is a species of warfare and that so much physical force is tolerated and the magnitude of the force exerted is so great that it renders injuries not actionable in

court; that even intentional batteries are beyond the scope of the judicial process.

Clark was an offensive back and just before the injury he had run a pass pattern to the right side of the Denver Broncos' end zone. The injury flowed indirectly from this play. The pass was intercepted by Billy Thompson, a Denver free safety, who returned it to mid-field. The subject injury occurred as an aftermath of the pass play.

As a consequence of the interception, the roles of Hackbart and Clark suddenly changed. Hackbart, who had been defending, instantaneously became an offensive player. Clark, on the other hand, became a defensive player. Acting as an offensive player, Hackbart attempted to block Clark by throwing his body in front of him. He thereafter remained on the ground. He turned, and with one knee on the ground, watched the play following the interception.

The trial court's finding was that Charles Clark, "acting out of anger and frustration, but without a specific intent to injure * * * stepped forward and struck a blow with his right forearm to the back of the kneeling plaintiff's head and neck with sufficient force to cause both players to fall forward to the ground." Both players, without complaining to the officials or to one another, returned to their respective sidelines since the ball had changed hands and the offensive and defensive teams of each had been substituted. Clark testified at trial that his frustration was brought about by the fact that his team was losing the game.

Due to the failure of the officials to view the incident, a foul was not called. However, the game film showed very clearly what had occurred. Plaintiff did not at the time report the happening to his coaches or to anyone else during the game. However, because of the pain which he experienced he was unable to play golf the next day. He did not seek medical attention, but the continued pain caused him to report this fact and the incident to the Bronco trainer who gave him treatment. Apparently he played on the specialty teams for two successive Sundays, but after that the Broncos released him on waivers. (He was in his thirteenth year as a player.) He sought medical help and it was then that it was discovered by the physician that he had a serious neck fracture injury.

Despite the fact that the defendant Charles Clark admitted that the blow which had been struck was not accidental, that it was intentionally administered, the trial court ruled as a matter of law that the game of professional football is basically a business which is violent in nature, and that the available sanctions are imposition of penalties and expulsion from the game. Notice was taken of the fact that many fouls are overlooked; that the game is played in an emotional and noisy environment; and that incidents such as that here complained of are not unusual.

The trial court spoke as well of the unreasonableness of applying the laws and rules which are a part of injury law to the game of professional football, noting the unreasonableness of holding that one player has a duty of care for the safety of others. He also talked about the concept of assumption of risk and contributory fault as applying and concluded that Hackbart had to recognize that he accepted the risk that he would be injured by such an act.

I.

## THE ISSUES AND CONTENTIONS

1. Whether the trial court erred in ruling that as a matter of policy the principles of law governing the infliction of injuries should be entirely refused where the injury took place in the course of the game.

2. Did the trial court err in concluding that the employee was not vicariously liable for an activity for which he had not received express authorization?

3. Whether it was error to receive in evidence numerous episodes of violence which were unrelated to the case at bar, that is, incidents of intentional infliction of injury which occurred in other games.

4. Whether it was error for the trial court to receive in evidence unrelated acts on the part of the plaintiff.

5. The final issue is whether the evidence justifies consideration by the court of the issue of reckless conduct as it is defined in A.L.I. Restatement of the Law of Torts Second, § 500, because (admittedly) the assault and battery theory is not available because that tort is governed by a one-year statute of limitations.

## II.

### WHETHER THE EVIDENCE SUPPORTED THE JUDGMENT

■ The evidence at the trial uniformly supported the proposition that the intentional striking of a player in the head from the rear is not an accepted part of either the playing rules or the general customs of the game of professional football. The trial court, however, believed that the unusual nature of the case called for the consideration of underlying policy which it defined as common law principles which have evolved as a result of the case to case process and which necessarily affect behavior in various contexts. From these considerations the belief was expressed that even *intentional* injuries incurred in football games should be outside the framework of the law. The court recognized that the potential threat of legal liability has a significant deterrent effect, and further said that private civil actions constitute an important mechanism for societal control of human conduct. Due to the increase in severity of human conflicts, a need existed to expand the body of governing law more rapidly and with more certainty, but that this had to be accomplished by legislation and administrative regulation. The judge compared football to coal mining and railroading insofar as all are inherently hazardous. Judge Matsch said that in the case of football it was questionable whether social values would be improved by limiting the violence.

Thus the district court's assumption was that Clark had inflicted an intentional blow which would ordinarily generate civil liability and which might bring about a criminal sanction as well, but that since it had occurred in the course of a football game, it should not be subject to the restraints of the law; that if it were it would place unreasonable impediments and restraints on the activity. The judge also pointed out that courts are ill-suited to decide the different social questions and to administer conflicts on what is much like a battlefield where the restraints of civilization have been left on the sidelines.

We are forced to conclude that the result reached is not supported by evidence.

## III.

### WHETHER INTENTIONAL INJURY IS ALLOWED BY EITHER WRITTEN RULE OR CUSTOM

Plaintiff, of course, maintains that tort law applicable to the injury in this case applies on the football field as well as in other places. On the other hand, plaintiff does not rely on the theory of negligence being applicable. This is in recognition of the fact that subjecting another to unreasonable risk of harm, the essence of negligence, is inherent in the game of football, for admittedly it is violent. Plaintiff maintains that in the area of contributory fault, a vacuum exists in relationship to intentional infliction of injury. Since negligence does not apply, contributory negligence is inapplicable. Intentional or reckless contributory fault could theoretically at least apply to infliction of injuries in reckless disregard of the rights of others. This has some similarity to contributory negligence and undoubtedly it would apply if the evidence would justify it. But it is highly questionable whether a professional football player consents or submits to injuries caused by conduct not within the rules, and there is no evidence which we have seen which shows this. However, the trial court did not consider this question and we are not deciding it.

■ Contrary to the position of the court then, there are no principles of law which allow a court to rule out certain tortious conduct by reason of general roughness of the game or difficulty of administering it.

Indeed, the evidence shows that there are rules of the game which prohibit the intentional striking of blows. Thus, Article 1, Item 1, Subsection C, provides that:

All players are prohibited from striking on the head, face or neck with the heel, back or side of the hand, wrist, forearm, elbow or clasped hands.

Thus the very conduct which was present here is expressly prohibited by the rule which is quoted above.

■ The general customs of football do not approve the intentional punching or striking of others. That this is prohibited was supported by the testimony of all of the witnesses. They testified that the intentional striking of a player in the face or from the rear is prohibited by the playing rules as well as the general customs of the game. Punching or hitting with the arms is prohibited. Undoubtedly these restraints are intended to establish reasonable boundaries so that one football player cannot intentionally inflict a serious injury on another. Therefore, the notion is not correct that all reason has been abandoned, whereby the only possible remedy for the person who has been the victim of an unlawful blow is retaliation.

## IV.

WAS IT LEGALLY JUSTIFIABLE FOR THE TRIAL COURT TO HOLD, AS A MATTER OF POLICY, THAT JURISDICTION SHOULD NOT BE ASSUMED OVER THE CASE IN VIEW OF THE FACT THAT IT AROSE OUT OF A PROFESSIONAL FOOTBALL GAME?

A. Whether the theory of judicial restraint applies.

■ It is a well-settled principle of federal jurisdiction that where a federal court does not have a discretion to accept or reject jurisdiction, if it does not have jurisdiction, it will not take it; but it is ruled, on the other hand, that if it has jurisdiction it must take it. This principle has been expressed many times with perhaps one of the best expressions being found in an early

opinion, that of Mr. Chief Justice Marshall in *Cohens v. Virginia,* 19 U.S. (6 Wheat.) 264, 404, 5 L.Ed. 257 (1821):

It is most true, that this court will not take jurisdiction if it should not: but it is equally true, that it must take jurisdiction, if it should. The judiciary cannot, as the legislature may, avoid a measure, because it approaches the confines of the constitution. We cannot pass it by, because it is doubtful. With whatever doubts, with whatever difficulties, a case may be attended, we must decide it, if it be brought before us. We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the constitution. Questions may occur, which we would gladly avoid; but we cannot avoid them. All we can do is, to exercise our best judgment, and conscientiously to perform our duty. In doing this, on the present occasion, we find this tribunal invested with appellate jurisdiction in all cases arising under the constitution and laws of the United States. We find no exception to this grant, and we cannot insert one.

Much more recently the Supreme Court in the case of *Willcox v. Consolidated Gas Co.,* 212 U.S. 19, 40, 29 S.Ct. 192, 195, 53 L.Ed. 382 (1909), speaking through Mr. Justice Peckham, stated that where a federal court is appealed to in the case over which it has by law jurisdiction, it is its duty to take such jurisdiction.

They assume to criticise that court [United States District Court for the Southern District of New York] for taking jurisdiction of this case, as precipitate, as if it were a question of discretion or comity, whether or not that court should have heard the case. On the contrary, there was no discretion or comity about it. When a Federal court is properly appealed to in a case over which it has by law jurisdiction, it is its duty to take such jurisdiction (*Cohens v. Virginia,* [19 U.S. 264,] 6 Wheat., 264, 404, 5 L.Ed. 257), and, in taking it, that court cannot be truthfully spoken of as precipitate in its con-

duct. That the case may be one of local interest only is entirely immaterial, so long as the parties are citizens of different States or a question is involved which by law brings the case within the jurisdiction of a Federal court. The right of a party plaintiff to choose a Federal court where there is a choice cannot be properly denied.

Mr. Justice Peckham expressed the view that the rule is based on the right of a party plaintiff to choose a federal court where there is a choice.

There are some recognized limitations on federal courts assuming jurisdiction, but none of these permit a court to exercise its own discretion on the subject. One example of limitation is the political question. Another is the doctrine of abstention, which is exercised where a state court is involved and deference is exercised in favor of the state court. *See, for example, Colorado River Water Conservation District v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). These, however, are the exceptions and not the rule as was pointed out in the cited case. Abstention itself is limited. It does not contemplate that federal courts abdicate their jurisdiction. *See American Trial Lawyers Association v. New Jersey Supreme Court,* 409 U.S. 467, 93 S.Ct. 627, 34 L.Ed.2d 651 (1973).

The Supreme Court has been known to refuse to exercise its *original* jurisdiction. *Ohio v. Wyandotte Chemicals Corporation,* 401 U.S. 493, 91 S.Ct. 1005, 28 L.Ed.2d 256 (1971). At the same time, it reiterated the traditional rule that where a federal court has jurisdiction it must exercise it. It is not at liberty to refuse to do so unless it is in accordance with one of the principles mentioned above. Original jurisdiction in the Supreme Court allows much more leeway to refusing acceptance of jurisdiction than does an inferior federal court.

It is clear that none of the grounds for refusing access to the courts are present in the instant case. One writer, Professor Keeton, has said that courts properly participate in the evolution and development of common law. We submit that this approach is at odds with refusing to accept the case. *See* Keeton, *Creative Continuity of Tort Law,* 75 Harv.L.Rev. 463 (1962). *See also* Widener, *Some Random Thoughts on Judicial Restraint,* 31 Wash. and Lee L.Rev. 505 (1974).[1]

The spirit and the letter of the decisions are that if jurisdiction to hear or determine cases exists, as it does in the case at bar, the cause is to be tried on its merits.

The position which was adopted by the trial court in this case was then directly contrary to all of the law dealing with the exercise of jurisdiction by federal courts.

B. Whether diversity jurisdiction provides any discretion.

It is of high importance to note the fact that in a diversity of citizenship case the federal district court sits as a state trial court and applies the law of the forum state. *See Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In this highly important decision the Supreme Court, through the late Justice Brandeis, overruled the early case of *Swift v. Tyson,* 41 U.S. (16 Pet.) 1, 10 L.Ed. 865 (1842), which had allowed federal trial courts to apply their own common law. The rule was established in *Erie* that the law of the state in which the court sat had to be applied to the diversity case. In rejecting the principle that the federal court could apply its own common law rule, the Court rejected the idea that a transcendental body of law existed for federal courts. It was said that there was no backup federal authority in the federal government to provide this power for federal courts; that the authoritative governing force was in the state courts.

---

1. Judge Widener of the U.S. Court of Appeals for the Fourth Circuit concluded that if a problem exists it "is not to say that the federal courts must avoid all the hard, or unpleasant, or distasteful questions," but rather the limitations should be on the basis that jurisdiction prohibits the acceptance of the case. Since Congress prescribed jurisdiction, the boundaries set by it should be followed.

Justice Holmes was quoted by Justice Brandeis (the author of *Erie* ) for the proposition that the authority in this diversity area must come from the state. A second basis for disapproval of federal authority or ability to innovate in diversity cases also originated with Justice Holmes, who said that the *Swift v. Tyson* rule was an unconstitutional assumption of power by the courts of the United States. The Supreme Court in *Erie* thus declared that in applying the theory of *Swift v. Tyson*, the Supreme Court and lower federal courts had invaded rights protected by the Constitution of the United States and the several states.

■ So, applying the *Erie* doctrine, the conclusion is that there does not exist an independent basis which allows a federal court to, in effect, outlaw a particular activity absent legal evidence that either state policy or state law dictates or allows such action. Absent any such evidence, the trial court cannot turn to public policy in order to support a conclusion that the courts cannot entertain a particular case.

■ Second, it is also fundamental that for every injury wrongfully inflicted, some redress under the state common law must be afforded since it is essential that citizens be able to look to their government for redress. As was said in *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 163, 2 L.Ed. 60 (1803), "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the law, whenever he received an injury. One of the first duties of government is to afford that protection."

■ The right of citizens to get relief in federal courts is similar to the same right in state court, bearing in mind that the federal courts in diversity cases are applying state law. We must also be cognizant that federal courts are limited to deciding cases or controversies. This was pointed out in *Flast v. Cohen,* 392 U.S. 83, 94–95, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). The Court there said:

those words limit the business of federal courts to questions presented in an adver-

sary context and in a form historically viewed as capable of resolution through the judicial process. And in part those words define the role assigned to the judiciary in a tripartite allocation of power to assure that the federal courts will not intrude into areas committed to the other branches of government.

392 U.S. at 95, 88 S.Ct. at 1950.

The Court in *Flast* was recognizing the right of a federal taxpayer to enjoin the spending of federal funds for the buying of books for use in religious schools. 392 U.S. at 105–06, 88 S.Ct. 1942.

The concurrence of Justice Douglas is worth noting, for he spoke on the right of access to the courts as follows:

The judiciary is an indispensable part of the operation of our federal system. With the growing complexities of government it is often the one and only place where effective relief can be obtained. If the judiciary were to become a super-legislative group sitting in judgment on the affairs of people, the situation would be intolerable. But where wrongs to individuals are done by violation of specific guarantees, it is abdication for the courts to close their doors.

392 U.S. at 111, 88 S.Ct. at 1958.

C. Does Colorado law provide or allow any restraint?

■ The next question is whether there are applicable restrictions in the Colorado law. On the contrary, the Colorado Constitution, Art. II, § 6, provides: "Court of justice shall be open to every person, and a speedy remedy afforded for every injury to person, property or character; and right and justice should be administered without sale, denial or delay." The district courts are said to be courts of unlimited jurisdiction unlike the federal courts. However, in a diversity case the federal court inherits the jurisdictional scope that is enjoyed by the state court within the district. Art. VI, § 9, subsection (1), provides:

The district courts shall be trial courts of record with general jurisdiction, and shall have original jurisdiction in all civil,

probate, and criminal cases, except as otherwise provided herein, and shall have such appellate jurisdiction as may be prescribed by law.

The Colorado courts have liberally construed these provisions. *See Patterson v. People,* 23 Colo.App. 479, 130 P. 618 (1913); *People ex rel. Cruz .v. Morley,* 77 Colo. 25, 234 P. 178 (1924). In the *Morley* case it was said: "[t]he constitutional jurisdiction of the district court is unlimited. It should not be limited without circumspection and no statute should be held to limit it unless it says so plainly * * *." 234 P. at 179.

The Colorado Supreme Court has held that under Art. II, § 6 of the Colorado Constitution, where there exists a right under the law, the courts of the state will assure the protection of that right. *O'Quinn v. Walt Disney Productions, Inc.,* 177 Colo. 190, 493 P.2d 344 (1972).

The common law, of course, obtains in Colorado. The legislature may modify it, but in the absence of evidence that the common law has been modified by legislation, the courts, that is, the district court and the federal district court in a diversity case, must apply it.

We are constrained to hold that the trial court's ruling that this case had to be dismissed because the injury was inflicted during a professional football game was error.

## V.

### IS THE STANDARD OF RECKLESS DISREGARD OF THE RIGHTS OF OTHERS APPLICABLE TO THE PRESENT SITUATION?

The Restatement of Torts Second, § 500, distinguishes between reckless and negligent misconduct. Reckless misconduct differs from negligence, according to the authors, in that negligence consists of mere inadvertence, lack of skillfulness or failure to take precautions; reckless misconduct, on the other hand, involves a choice or adoption of a course of action either with knowledge of the danger or with knowledge of facts which would disclose this danger to a reasonable man. Recklessness also differs in that it consists of intentionally doing an act with knowledge not only that it contains a risk of harm to others as does negligence, but that it actually involves a risk substantially greater in magnitude than is necessary in the case of negligence. The authors explain the difference, therefore, in the degree of risk by saying that the difference is so significant as to amount to a difference in kind.

Subsection (f) also distinguishes between reckless misconduct and intentional wrongdoing. To be reckless the *act* must have been intended by the actor. At the same time, the actor does not intend to cause the harm which results from it. It is enough that he realized, or from the facts should have realized, that there was a strong probability that harm would result even though he may hope or expect that this conduct will prove harmless. Nevertheless, existence of probability is different from substantial certainty which is an ingredient of intent to cause the harm which results from the act.

Therefore, recklessness exists where a person knows that the act is harmful but fails to realize that it will produce the extreme harm which it did produce. It is in this respect that recklessness and intentional conduct differ in degree.

In the case at bar the defendant Clark admittedly acted impulsively and in the heat of anger, and even though it could be said from the admitted facts that he intended the act, it could also be said that he did not intend to inflict serious injury which resulted from the blow which he struck.

In ruling that recklessness is the appropriate standard and that assault and battery is not the exclusive one, we are saying that these two liability concepts are not necessarily opposed one to the other. Rather, recklessness under § 500 of the Restatement might be regarded, for the purpose of analysis at least, a lesser included act.

Assault and battery, having originated in a common law writ, is narrower than recklessness in its scope. In essence, two definitions enter into it. The assault is an attempt coupled with the present ability to commit a violent harm against another. Battery is the unprivileged or unlawful touching of another. Assault and battery then call for an intent, as does recklessness. But in recklessness the intent is to do the act, but without an intent to cause the particular harm. It is enough if the actor knows that there is a strong probability that harm will result. Thus, the definition fits perfectly the fact situation here. Surely, then, no reason exists to compel appellant to employ the assault and battery standard which does not comfortably apply fully in preference to the standard which meets this fact situation.

## VI.

### WHICH OF THE STATUTES OF LIMITATIONS APPLIES?

The appellees contend that Clark was guilty of an assault and battery, if he was guilty of anything; that this is barred by the applicable statute of limitations for a one-year period. Appellant, however, contends that the injury was the result of reckless disregard of the rights of the plaintiff and that the six-year statute provided in Colo.Rev.Stat.Ann. § 13–80–110, is applicable.

Our court in the recent decision in *Zuniga v. Amfac Foods, Inc.,* 580 F.2d 380 (10th Cir. 1978), adopted the position that actions in tort are governed by the six-year provision in the cited statute. It is also to be noted that Colorado fully recognizes the action of reckless disregard for the rights of others. *See Pettingell v. Moede,* 129 Colo. 484, 271 P.2d 1038 (1954); *Fanstiel v. Wright,* 122 Colo. 451, 222 P.2d 1001 (1950); *Shoemaker v. Mountain States Tel. & Tel. Co.,* 559 P.2d 721 (Colo.App.1976). The definitions contained in § 500 are fully applicable here, and the Colorado Supreme Court in *Fanstiel v. Wright, supra,* has adopted the definition contained in § 500. A Com-

ment to the section discusses the distinctions which we have previously mentioned.

We conclude that if the evidence establishes that the injuries were the result of acts of Clark which were in reckless disregard of Hackbart's safety, it can be said that he established a claim which is subject to the six-year statute. The cause has not been tried on its merits, but there is substantial evidence before us that supports the notion that Clark did act in accordance with the tests and standards which are set forth in § 500, *supra.* We are not prejudging this issue of fact, but are merely saying that considered in a light favorable to the plaintiff, at this stage of the proceedings the hypothesis exists that Clark's conduct would constitute a violation of § 500 and the appellant should be given an opportunity to offer his proofs in court on this subject.

## VII.

### DID THE COURT ERR IN RECEIVING IN EVIDENCE FILMS OF VIOLENCE THAT TOOK PLACE IN OTHER FOOTBALL GAMES REGARDLESS OF THE IDENTITY OF THE PLAYERS AND TEAMS?

There was a film of the actual injury suffered by plaintiff. It showed the sequence of events and also depicted the manner of infliction. Obviously we need not consider the relevancy of this.

There were incidents that were designed to show that the plaintiff Hackbart was a dirty player.

Finally, films were shown which depicted acts of violence between other players and other teams.

The Federal Rules of Evidence, Rule 401, define relevant evidence as follows:

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Rule 404 deals with character evidence and other crimes. That which deals with character states as follows:

(a) Character evidence generally. Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:

(1) Character of accused. Evidence of a pertinent trait of his character offered by an accused, or by the prosecution to rebut the same;

(2) Character of victim. Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor;

(3) Character of witness. Evidence of the character of a witness, as provided in Rules 607, 608, and 609.

Subsection (b) of Rule 404 deals with other wrongs or acts and states the traditional rule that:

(b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

■ Unless the game of football is on trial, and it appeared to be in the case at bar, the acts of violence which occurred in other games and between other teams and players were without relevance. The view we take is that the game of football is not on trial, but, rather, the trial involves a particular act in one game.

■ Although we recognize that the trial court has a broad discretion in receiving or rejecting evidence along this line, we fail to see the relevancy of other acts which are unconnected with the incident being tried.

■ The other aspect, namely the proof of the character of the plaintiff by production of prior acts, would be admissible only if his character was an issue in the case. Unless the plaintiff was shown to have been an unlawful aggressor in the immediate incident, his prior acts could not be relevant. The indications from the picture of the action here are that he threw a body block and after the lapse of some time, a short period of time, the blow was struck while Hackbart was down on his knee watching the action. Therefore, this evidence would appear to be questionable if not irrelevant.

■ On retrial the admissibility of prior unrelated acts should be very carefully considered and should not be received merely for the purpose of showing that the defendant himself had violated rules in times past since this is not per se relevant. Indeed it would be necessary for an issue to exist as to whether Hackbart was the aggressor in order for such evidence to be relevant.

\*　　\*　　\*　　\*　　\*　　\*

In sum, having concluded that the trial court did not limit the case to a trial of the evidence bearing on defendant's liability but rather determined that as a matter of social policy the game was so violent and unlawful that valid lines could not be drawn, we take the view that this was not a proper issue for determination and that plaintiff was entitled to have the case tried on an assessment of his rights and whether they had been violated.

The trial court has heard the evidence and has made findings. The findings of fact based on the evidence presented are not an issue on this appeal. Thus, it would not seem that the court would have to repeat the areas of evidence that have already been fully considered. The need is for a reconsideration of that evidence in the light of that which is taken up by this court in its opinion. We are not to be understood as limiting the trial court's consideration of supplemental evidence if it deems it necessary.

The cause is reversed and remanded for a new trial in accordance with the foregoing views.