Stephen McKICHAN,
Plaintiff/Respondent/Cross–Appellant,

v.

ST. LOUIS HOCKEY CLUB, L.P.,
Defendant/Appellant/Cross–
Respondent.

Nos. 72261, 72267.

Missouri Court of Appeals,
Eastern District,
Division One.

March 17, 1998.

Application for Transfer Denied
June 16, 1998.

Russell F. Watters, T. Michael Ward, Paul J. Schulte, Bart Zuckerman, St. Louis, for appellant.

James P. Feeney, Mark A. Fisher, Bloomfield Hills, MI, Jeffrey J. Lowe, St. Louis, for respondent.

GRIMM, Presiding Judge.

In this personal injury case, plaintiff, a professional hockey goaltender, was injured during a game. He sued the opposing player (defendant player) who charged into him. In addition, he sued the defendant player's "owner," defendant herein.

Defendant player filed a counterclaim. About three weeks before trial, plaintiff and defendant player dismissed their claims against each other with prejudice. The case proceeded against defendant under a vicarious liability theory and a jury awarded plaintiff $175,000.

Both parties appeal. Defendant raises six points; its second point controls. In that point, defendant alleges the trial court erred in finding it vicariously liable for defendant player's acts because the conduct at issue was a risk inherent in professional hockey and one assumed by plaintiff. We agree and reverse. Plaintiff's cross-appeal claiming the trial court erred in granting defendant's motion for directed verdict on his punitive damages claim is denied as moot.

## I. Background

In 1988, plaintiff signed a contract with the Vancouver Canucks, a professional National Hockey League team. The team assigned him to its professional "minor league" International Hockey League (IHL) team, the Milwaukee Admirals.

On December 15, 1990, the Milwaukee Admirals played the Peoria Rivermen in a regulation IHL game in Peoria, Illinois. The Peoria Rivermen is an IHL team affiliated with defendant.

IHL hockey is played on an ice rink measuring at least 200 feet by 85 feet with goals on opposing ends of the ice. The rink is surrounded by a wall made partially of clear plexiglass, customarily referred to as the "boards."

The rink is divided in two by a center line. On each side of the center line is a line called the "blue line." The blue lines are parallel to the center line and have to be at least 60 feet from the boards behind the goals. A game consists of three twenty-minute periods.

In the second period, an incident took place between plaintiff and defendant player. Plaintiff was penalized as a result of that incident.

During the third period, plaintiff and defendant player were both playing and "on the ice." A videotape of the incident discloses that defendant player was skating near center ice and plaintiff was positioned in front of

his goal. The hockey puck was shot in the general direction of plaintiff's goal by defendant player's teammate. However, it traveled over the goal and the boards and out of play. As the puck was traveling, plaintiff skated several yards to the side of the goal.

A linesman blew his whistle stopping play. About this time, plaintiff began turning his body toward the boards and moved closer to them. As plaintiff was moving away from the goal, defendant player was skating from the near blue line toward plaintiff.

Defendant player continued skating toward plaintiff after a second whistle. Holding his stick, defendant player partially extended both arms and hit plaintiff with his body and the stick, knocking plaintiff into the boards. Plaintiff fell to the ice and was knocked unconscious. Defendant player received a "match penalty" from the referee and was suspended for a period of games by the IHL.

## II. Discussion

Defendant's second point alleges the trial court erred in denying its motion for judgment notwithstanding the verdict. It contends that the "contact at issue, a check between opposing players, is a risk inherent in professional hockey and one assumed by professional hockey players."

The case was tried under Illinois contact sports law as it has been applied to amateur sports. To the extent that this law is relevant, the practical significance of which forum's law applies is minimal if any because Missouri has essentially adopted the Illinois standard.

In amateur contact sports, both Illinois and Missouri courts have held that ordinary negligence is insufficient to state a claim for an injury caused by a co-participant. *See, e.g. Pfister v. Shusta*, 167 Ill.2d 417, 212 Ill.Dec. 668, 669, 657 N.E.2d 1013, 1014 (1995); *Ross v. Clouser*, 637 S.W.2d 11, 14 (Mo.banc 1982). Rather, in amateur contact sports, liability must be predicated on "willful and wanton or intentional misconduct." *Pfister*, 212 Ill.Dec. at 669, 657 N.E.2d at 1014.

In *Pfister*, the plaintiff and the defendant were engaged in a spontaneous can kicking game in the hall of a college dormitory. During the game, the plaintiff allegedly pushed the defendant and the defendant responded by pushing the plaintiff. As a result, the plaintiff was injured when his left hand and forearm went through a glass door of a fire extinguisher case. *Id.* at 670, 657 N.E.2d at 1015. The Illinois Supreme Court adopted the "willful and wanton" requirement first created by an Illinois appellate court in *Nabozny v. Barnhill*, 31 Ill.App.3d 212, 334 N.E.2d 258 (1975).

*Nabozny* involved a high school soccer game. The plaintiff, a goalie, went down on his left knee, received a pass, and pulled the ball to his chest. The defendant, an opposing player, was running toward the ball and continued to run toward the plaintiff after he gained possession of the ball. The defendant kicked the plaintiff's head causing injuries. *Id.* 334 N.E.2d at 259–60.

The *Nabozny* court held that the ordinary care standard did not apply in this amateur contact sport. Instead, it adopted a new rule "in order to control a new field of personal injury litigation." *Id.* at 261. It held that a participant would be liable for injuries if the participant's conduct was either "deliberate, wilful or with a reckless disregard for the safety of the other player." *Id.* at 261

Missouri essentially adopted the *Nabozny* rule in *Ross*. *Ross*, 637 S.W.2d at 13–14. *Ross* involved a slow pitch church league softball game. There, the defendant base runner was injured after colliding with the plaintiff, an opposing third baseman. *Id.* at 13. The trial court submitted the case to the jury on a negligence theory. In reversing and remanding, the supreme court stated "a cause of action for personal injuries incurred during athletic competition must be predicated on recklessness, not mere negligence...." *Id.* at 13–14. This heightened standard has been accepted by many jurisdictions and applied to both formal and informal amateur contact sports. *See Pfister*, 212 Ill.Dec. at 670–671, 657 N.E.2d at 1015–1016.

Under these decisions involving amateur contact sports, ordinary negligence principles are inapplicable. Thus, these courts have

implicitly found that conduct which might be "unreasonable" in everyday society is not actionable because it occurs on the athletic field. In contact sports, physical contact and injuries among participants is inherent and unwarranted judicial intervention might inhibit the game's vigor. *See Pfister,* 212 Ill.Dec. at 673, 657 N.E.2d at 1018; *Ross,* 637 S.W.2d at 14.

All of the above cases discuss the contact sports law in the context of amateur sports. Neither parties' briefs, nor our own research, disclose any Illinois or Missouri case applying the contact sports law to professional sports. In fact, the parties have referred us to only two cases discussing participant liability in professional athletics, *Averill v. Luttrell,* 44 Tenn.App. 56, 311 S.W.2d 812 (1957) and *Hackbart v. Cincinnati Bengals, Inc.,* 601 F.2d 516 (10th Cir.1979).

*Averill* involves minor league professional baseball players. There, the plaintiff was at bat when the pitcher threw three inside pitches and a fourth pitch which hit the plaintiff. The plaintiff threw his bat in the direction of the pitcher's mound. As that happened, the catcher, "without any warning whatsoever, stepped up behind [the plaintiff] and struck him a hard blow on the side or back of the head with his fist." *Id.* 311 S.W.2d at 814. The plaintiff sued both the catcher and his baseball club and obtained a judgment against both defendants.

Only the baseball club appealed. The *Averill* court reversed the judgment. The opinion does not discuss the standard of care owed by one professional player to another. Rather, it held that the club was not liable for the wilful acts of the catcher when he stepped outside of the club's business and committed an act wholly independent and foreign to the scope of his employment. *Id.*

The other case is *Hackbart.* In that case, the plaintiff, a professional football player, placed one knee on the ground after his team intercepted a pass and watched the play. An opposing player hit the back of the plaintiff's head with his right forearm, causing both players to fall to the ground. *Hackbart,* 601 F.2d at 519. Later, the plaintiff sued the opposing player and his team for a neck injury. The trial court entered judgment for the defendants and the plaintiff appealed. On appeal, the *Hackbart* court reversed and remanded. *Id.* at 527. It held that "recklessness is the appropriate standard." *Id.* at 524.

In addition to considering whether the contact sports exception is applicable to the facts before us, the doctrines of assumption of risk and consent also must be considered. In general, a voluntary participant in any lawful sport assumes all risks that reasonably inhere to the sport insofar as they are obvious and usually incident to the game. *See Pfister,* 212 Ill.Dec. at 673, 657 N.E.2d at 1018. Under contact sports analysis as applied to amateur sports, participants in team sports assume greater risks of injury than nonparticipants or participants in non-contact sports. *Id.* at 672, 657 N.E.2d at 1017.

In practice, the concepts of duty, assumption of risk, and consent must be analyzed on a case-by-case basis. Whether one player's conduct causing injury to another is actionable hinges upon the facts of an individual case. *Ross,* 637 S.W.2d at 14. Relevant factors include the specific game involved, the ages and physical attributes of the participants, their respective skills at the game and their knowledge of its rules and customs, their status as amateurs or professionals, the type of risks which inhere to the game and those which are outside the realm of reasonable anticipation, the presence or absence of protective uniforms or equipment, the degree of zest with which the game is being played, and other factors. *Id.*

We apply these concepts and factors to the case before us. The specific game was a professional hockey game, not an amateur game. It was not a pickup, school, or college game.

Rough play is commonplace in professional hockey. Anyone who has attended a professional hockey game or seen one on television recognizes the violent nature of the sport. In order to gain possession of the puck or to slow down the progress of opponents, players frequently hit each other with body checks. They trip opposing players, slash at them with their hockey sticks, and fight on a regu-

lar basis, often long after the referee blows the whistle. Players regularly commit contact beyond that which is permitted by the rules, and, we are confident, do it intentionally. They wear pads, helmets and other protective equipment because of the rough nature of the sport.

Professional hockey is played at a high skill level with well conditioned athletes, who are financially compensated for their participation. They are professional players with knowledge of its rules and customs, including the violence of the sport. In part, the game is played with great intensity because its players can reap substantial financial rewards. We also recognize that the professional leagues have internal mechanisms for penalizing players and teams for violating league rules and for compensating persons who are injured.

In summary, we find that the specific conduct at issue in this case, a severe body check, is a part of professional hockey. This body check, even several seconds after the whistle and in violation of several rules of the game, was not outside the realm of reasonable anticipation. For better or for worse, it is "part of the game" of professional hockey. As such, we hold as a matter of law that the specific conduct which occurred here is not actionable.

The trial court's judgment is reversed.

PUDLOWSKI, J., concurs.

GARY M. GAERTNER, J., dissents.