**Levi MOHNEY, Mary Mohney, and Timothy Mohney, Plaintiffs–Appellants,**

**v.**

**USA HOCKEY, INC., et al., Defendants–Appellees.**

No. 00–3105.

United States Court of Appeals, Sixth Circuit.

March 1, 2001.

Before BOGGS and MOORE, Circuit Judges, and BELL,* District Judge.

OPINION

MOORE, Circuit Judge.

The plaintiffs, Levi Mohney, and his parents, Timothy and Mary Mohney, appeal the district court's judgment granting summary judgment in favor of all defendants in this action arising out of a paralyzing injury to Levi which occurred during an ice hockey scrimmage. The Mohneys also appeal the district court's partial grant of defendants' motions to strike and denial of the Mohneys' motion to compel discovery and motion for sanctions. We AFFIRM the district court's grant of summary judgment in favor of defendants Jason Reneger and USA Hockey, the Central States Hockey League, and the Toledo Cherokees (these three hereinafter referred to as the "hockey defendants"). We REVERSE the district court's grant of summary judgment to Bauer and Karhu (hereinafter referred to as the "manufacturer defendants") and REMAND to the district court to allow the Mohneys' product liability claims to proceed. Finally, we AFFIRM the district court's partial grant of defendants' motions to strike and denial of the Mohneys' motion to compel and motion for sanctions.

I

The plaintiffs are Levi Mohney and his parents, Timothy and Mary Mohney. The defendant USA Hockey, Inc., a/k/a Ama-

---

* The Honorable Robert Holmes Bell, United States District Judge for the Western District of Michigan, sitting by designation.

teur Hockey Association of the United States, Inc., is the national governing body for amateur hockey; Central States Hockey League ("CSHL") is a regional arm of USA Hockey; and the Toledo Cherokees, Jr. Club, d/b/a Toledo Cherokees, is a Junior B Level amateur hockey team comprised of players between sixteen and twenty years old and is a USA Hockey member team. Jason Reneger, a player for the Toledo Cherokees is also a defendant in this action. The manufacturer defendants are Cooper of Canada, Ltd., n/k/a Bauer, Inc., and Jofa Facemasks, d/b/a Karhu USA, Inc., which manufactured the helmet and facemask, respectively. During a scrimmage held on May 21, 1995, Levi crashed into the boards of the rink as he and Reneger were racing for a loose puck. Levi suffered a paralyzing injury which left him a quadriplegic. He was seventeen years old at the time of his injury and one week short of his eighteenth birthday.

Levi was a participant in an ice hockey "development camp" held by the Cherokees on May 20–21, 1995 in Sylvania, Ohio. He was playing on the "white" team and the defendant Reneger was playing on the "red" team. One of Levi's teammates shot the puck past the red team's "icing line" (this line marks an area at the opposite end of the rink where the red team protects its goal), in a situation known as "icing the puck." USA Hockey rules provide that when the puck crosses the opposing team's icing line, an automatic icing call is made followed by a face-off. During the development camp, however, the Cherokees elected to play by the National Hockey League ("NHL") rule known as "touch icing" whereby a player from the team which shot the puck past the opposing team's icing line can prevent an adverse icing call by gaining control of the puck first. A player from the opposing team can also cause an adverse icing call

by being the first to "touch" the puck. Under the NHL "touch icing" rule, players from both teams have an incentive to gain control of the puck first. By contrast, under the USA Hockey "automatic icing" rule, this incentive vanishes because once the puck has crossed the icing line, an adverse icing call will automatically be made.

During the scrimmage on May 21, 1995, both Levi and Reneger were competing with each other to gain control of the puck. Levi cut in front of Reneger and eventually Reneger was positioned immediately behind Levi. The two players headed quickly towards the boards. Upon impact with the boards, Levi crumpled to the ice. At the time of this collision, Levi was wearing a helmet manufactured by Bauer and a facemask produced by Karhu. When Levi's helmet and faceguard crashed into the boards, a clip holding the faceguard broke off.

On September 5, 1994, Levi and his father, Timothy Mohney, both signed a form, "USA Hockey Individual Membership Registration 1994–95" which contained the following provision:

*Release of Liability/Acknowledgment of Risk*

Upon entering events sponsored by USA Hockey and/or its member districts, I/We agree to abide by the rules of USA Hockey as currently published. I/We understand and appreciate that participation or observation of the sport constitutes a risk to me/us of serious injury, including permanent paralysis or death. I/We voluntarily and knowingly recognize, accept, and assume this risk and release USA Hockey, its Affiliates, their sponsors, event organizers and officials from any liability therefore.

J.A. at 284 (Registration Form). The form continued, "Read Above Before Signing.

All Participants MUST sign and date this form. If player is 17 years of age or younger the parent/guardian must *print* and *sign* their name and date the form." J.A. at 284 (Registration Form). Levi and Timothy Mohney signed similar USA Hockey Registration Forms for 1991–92, 1992–93, and 1993–94. *See* J.A. at 285–87 (Past Registration Forms).

On May 21, 1997, the Mohneys filed this suit to recover for Levi's physical injuries. Levi's parents also bring claims for loss of consortium, and the Mohneys raise product liability claims regarding the Bauer helmet and Karhu faceguard. The district court entered a Case Management Order on October 22, 1997 limiting discovery to issues concerning the validity of the release and the issue of assumption of the risk. All defendants moved for summary judgment and the district court entered judgment in their favor on December 14, 1999. The district court also granted in part the hockey defendants' motions to strike and denied the Mohneys' motion to compel and motion for sanctions. The Mohneys timely filed their notice of appeal.

## II

### A. Motion to Strike

■■■ We review the district court's "decision to grant or deny a motion to strike for an abuse of discretion, and decisions that are reasonable, that is, not arbitrary, will not be overturned." *Collazos–Cruz v. United States,* No. 96–5452, 1997 WL 377037, at *2 (6th Cir. July 3, 1997) (per curiam). Pursuant to Federal Rule of Civil Procedure 56(e), the hockey defendants moved to strike portions of eighteen affidavits and other evidence submitted by the Mohneys. FED R. CIV. P. 56(e). The district court granted in part and denied in part these motions to strike. On appeal, the Mohneys only explicitly challenge

the district judge's decision to strike an October 1996 article written by Dr. Alan Ashare. The district court correctly concluded that Dr. Ashare's article was inadmissible to show that the hockey defendants were on notice as to the danger of spinal injuries in ice hockey because the article was written after the date of Levi's injury. The district court's ruling which struck this evidence was not an abuse of discretion and is therefore AFFIRMED.

### B. Motions for Summary Judgment

We review de novo a district court's order granting summary judgment. *Richardson v. Township of Brady,* 218 F.3d 508, 512 (6th Cir.2000). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). On review of the district court's grant of summary judgment, "we view the evidence and draw all reasonable inferences therefrom in favor of the nonmoving party." *Richardson,* 218 F.3d at 512.

The movant bears the initial burden of establishing the absence of a genuine issue of material fact to support the nonmovant's case. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). A genuine issue of material fact exists when a reasonable jury could find for the non-moving party on that issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the movant meets her initial burden, the nonmoving party must set forth specific facts demonstrating that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249, 106 S.Ct. 2505. "The mere existence

of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Id.* at 252, 106 S.Ct. 2505.

■ This is a diversity action which the parties and district court treated as arising under Ohio law. As the Supreme Court held in *Erie Railroad v. Tompkins,* "[e]xcept in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state." *Erie R.R. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).[1] When sitting in diversity, the federal courts "must apply state law in accordance with the then controlling decision of the highest state court." *Grantham & Mann v. American Safety Prods.,* 831 F.2d 596, 608 (6th Cir.1987) (internal quotation omitted). "[W]here a state appellate court has resolved an issue to which the high court has not spoken, we will normally treat [those] decisions ... as authoritative absent a *strong showing* that the state's highest court would decide the issue differently." *Kirk v. Hanes Corp. of No. Carolina,* 16 F.3d 705, 707 (6th Cir. 1994) (quotation omitted). *See also Commissioner v. Estate of Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967).

1. Assumption of Risk in Sports or Recreational Activities

■ In *Marchetti v. Kalish,* the plaintiff brought an action after the defendant collided with her during a game of "kick the can," causing her to fall and break her leg in two places. *Marchetti v. Kalish,* 53 Ohio St.3d 95, 559 N.E.2d 699, 699–700 (Ohio 1990). The Ohio Supreme Court established the standard for cases such as this one, involving injuries during a sporting event: "Where individuals engage in recreational or sports activities, they assume the ordinary risks of the activity and cannot recover for any injury unless it can be shown that the other participant's actions were either 'reckless' or 'intentional' as defined in Sections 500 and 8A of the Restatement of Torts 2d." *Id.* at 699 syllabus.

Intentional conduct occurs when "the actor desires to cause consequences of his act, or ... he believes that the consequences are substantially certain to result from it." *Marchetti,* 559 N.E.2d at 700 n. 2 (quoting Restatement (Second) of Torts § 8A (1965)). By contrast, "[t]he actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent." *Id.* (quoting Restatement (Second) of Torts § 500). "What constitutes an unreasonable risk under the circumstances of a sporting event must be delineated with reference to the way the particular game is played, *i.e.,* the rules and customs that shape the participants' ideas of foreseeable conduct in the course of a game." *Thompson v. McNeill,* 53 Ohio St.3d 102, 559 N.E.2d 705, 708 (Ohio 1990).

2. Ohio law Regarding Contract Construction and Releases

■ Under Ohio law, "[i]t is well established that the construction of contracts is

---

**1.** The Supreme Court's decision in *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), directs an Ohio federal court to apply Ohio law, including Ohio choice of law rules. Since the parties have not objected to the application of Ohio law to all aspects of the case, we apply Ohio law.

a matter of law to be resolved by the court." *Lovewell v. Physicians Ins. Co. of Ohio,* 79 Ohio St.3d 143, 679 N.E.2d 1119, 1121 (Ohio 1997). Courts give common words appearing in a written instrument "their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument." *Alexander v. Buckeye Pipe Line Co.,* 53 Ohio St.2d 241, 374 N.E.2d 146, 148 syllabus para. 2 (Ohio 1978). Generally, "[t]he intent of the parties is presumed to reside in the language they chose to use in their agreement." *Graham v. Drydock Coal Co.,* 76 Ohio St.3d 311, 667 N.E.2d 949, 952 (Ohio 1996).

■ Participants in sporting or recreational activities are free to contract with the proprietor "to relieve the proprietor of responsibility to the participant for the proprietor's negligence, but not for the proprietor's willful or wanton misconduct." *Bowen v. Kil–Kare,* 63 Ohio St.3d 84, 585 N.E.2d 384, 390 (Ohio 1992). Under Ohio law, "willful" misconduct is defined as "conduct involving an intent, purpose or design to injure." *Zivich v. Mentor Soccer Club,* 82 Ohio St.3d 367, 696 N.E.2d 201, 207 (Ohio 1998) (internal quotation omitted). "Wanton" misconduct is defined as "conduct where one fails to exercise any care whatsoever toward those to whom he owes a duty of care, and [t]his failure occurs under circumstances in which there is a great probability that harm will result." *Id.* (internal quotation omitted). In *Zivich v. Mentor Soccer Club,* the Ohio Supreme Court held that, "[p]arents have the authority to bind their minor children to exculpatory agreements in favor of volunteers and sponsors of nonprofit sports

activities where the cause of action sounds in negligence. These agreements may not be disaffirmed by the child on whose behalf they were executed."[2] *Id.* at 201 syllabus para. 1. The court further concluded that "[p]arents may release their own claims arising out of injury to their minor children." *Id.* at 201 syllabus para. 2.

### C. Summary Judgment as to Jason Reneger

■ In *Thompson v. McNeill,* the Supreme Court of Ohio recognized that special standards for tort liability apply to participants in sporting activities. "It is necessary to fashion a special rule for tort liability between participants in a sporting event because playing fields, golf courses, and boxing rings are places in which behavior that would give rise to tort liability under ordinary circumstances is accepted and indeed encouraged." *Thompson,* 559 N.E.2d at 707. "A player who injures another player in the course of a sporting event by conduct that is a foreseeable customary part of the sport cannot be held liable for negligence because no duty is owed to protect the victim from that conduct." *Id.* at 706 syllabus para. 2. Thus, for defendant Reneger to be held liable for Levi's injuries, Reneger's conduct must be intentional or reckless, not merely negligent. *See id.* at 705 syllabus para. 1. To determine whether Reneger's conduct rose to this level, we look to the customs and rules of the game of hockey. *See id.* at 708.

■ The district court granted summary judgment to defendant Reneger and explained that the collision between Levi and Reneger was an accident and that no reasonable jury could find Reneger to have

---

**2.** "Exculpatory agreements, also called releases or waivers, are basically written documents in which one party agrees to release, or exculpate, another from potential tort liability for future conduct covered in the agreement." *Zivich,* 696 N.E.2d at 204 n. 3 (internal quotation omitted).

acted recklessly or intentionally. The Mohneys, however, contend that the district court erred by substituting its judgment for that of a jury. Under Ohio law, "[r]ecognition of the inverse relationship between duty and dangerousness should enter into a court's decision-making process on a motion for summary judgment when the plaintiff alleges reckless or intentional misconduct." *Thompson,* 559 N.E.2d at 708. Thus, "[a] court should inquire more specifically into the following factors ... the nature of the sport involved, the rules and regulations which govern the sport, the customs and practices which are generally accepted and which have evolved with the development of the sport, and the facts and circumstances of the particular case." *Id.* at 708–09 (internal quotation omitted).

■ The Ohio Supreme Court has recognized that hockey is a dangerous sport for which "[i]njuries are a regular occurrence." *Thompson,* 559 N.E.2d at 707. We note that other courts have held that body contact and collisions between players are accepted, customary occurrences within the realm of hockey play. *See, e.g., McKichan v. St. Louis Hockey Club.* 967 S.W.2d 209, 213 (Mo.Ct.App.1998). While the level of injury sustained by Levi is not itself a regular occurrence in hockey, the risk of such injury is at least reasonably anticipated. Defendant Reneger did not take any action that would indicate reckless or intentional misconduct. We agree with the district court that no reasonable jury could find that Reneger acted recklessly or intentionally. Accordingly, the district court's grant of summary judgment to defendant Reneger is AFFIRMED.

D. Validity of Release as to Hockey Defendants

■ We conclude as a matter of law that the 1994–95 release was valid and that the hockey defendants are covered by the terms of this release. The language is clear and unambiguous that the release applies to USA Hockey sponsored events that occur between 1994 and 1995 and that there is no limitation in scope based on whether the event occurred in the pre-season or post-season. The release therefore applies to injuries sustained during the Cherokees development camp held on May 20–21, 1995 which arose out of negligence by the hockey defendants, but does not bar the Mohneys' recovery for any willful or wanton misconduct by the hockey defendants.

■ We also note that Levi and his father have signed similar releases in 1991–92, 1992–93, and 1993–94. "A person who signs a contract without making a reasonable effort to know its contents cannot, in the absence of fraud or mutual mistake, avoid the effect of the contract." *Pippin v. M.A. Hauser Enters., Inc.,* 111 Ohio App.3d 557, 676 N.E.2d 932, 937 (Ohio Ct.App.1996). This rule applies "even in cases where the person seeks to avoid the effect of the contract by citing ignorance of the contract's contents or a failure to understand those contents." *Id.* Therefore, because the Mohneys are presumed to understand the contents of their contract, they cannot now claim to lack understanding of the contents of the 1994–95 release.

Finally, the validity of the release is unaffected by whether or not a USA Hockey rule was violated. The Mohneys point to the language of the release that, "[u]pon entering events sponsored by USA Hockey and/or its member districts. I/We agree to abide by the Rules of USA Hockey as currently published." J.A. at 284 (Release). This language captures Levi's agreement to abide by USA Hockey's

rules but it does not create a contingency that the validity of the release depends on whether or not there is an infraction of these rules. The key question therefore is whether, within the context of ice hockey, slamming into the boards as Levi did is a reasonably anticipated, albeit unfortunate occurrence. *See Thompson,* 559 N.E.2d at 708. Unpersuaded by the Mohneys' challenges, we conclude that the release is valid as applied to the hockey defendants.

### E. Summary Judgment as to the Hockey Defendants

 In light of the valid release, the hockey defendants can be liable to the Mohneys only if their actions constitute wanton and willful misconduct. *See Bowen,* 585 N.E.2d at 390. The Mohneys argue that the hockey defendants committed wanton and willful misconduct by failing to warn Levi of the increased risk of spinal injury from playing by touch icing rules. The district court correctly concluded, however, that no reasonable jury could find that the failure of the hockey defendants to warn Levi of the risks of spinal injury due to touch icing was willful and wanton. It is undisputed that hockey is a dangerous sport where serious injury, including spinal paralysis, is one of the risks of the game. There is no evidence in the record that the hockey defendants intended for Levi to be injured or that they acted wantonly. *See Zivich,* 696 N.E.2d at 207. Therefore, the district court's order granting summary judgment in favor of the hockey defendants is AFFIRMED.

### F. Summary Judgment as to the Manufacturer Defendants

 The release at issue provides that participants "release USA Hockey, its Affiliates, their sponsors, event organizers and officials from liability therefore." J.A. at 284 (Release). Based on this language, the district court found that the 1994–95 release barred the Mohneys' claims against Bauer and Karhu, because they are "sponsors" of USA Hockey. We disagree. The release cannot as a matter of law preclude potential product liability claims against Bauer and Karhu in their roles as manufacturers of the helmet and facemask, as distinguished from sponsors.[3] The plain language of the release does not preclude a player from bringing product liability claims against the manufacturers of any defective equipment.

 Additionally, the district court specifically limited the scope of discovery to "the validity, coverage, and enforceability of the release signed by Plaintiffs Levi Mohney and Timothy Mohney as to each party, and on the issue of assumption of the risk." (Case Management Conference Order of Oct. 22, 1997).[4] In accord with this Order, "the parties have limited their [summary judgment] briefing to the issues of (1) whether Plaintiffs' claims are barred by express assumption of the risk, and (2) whether Plaintiffs' claims are barred by primary assumption of the risk." J.A. at 45–46 (D.Ct.Op.).

It was thus error for the district court to grant summary judgment as to the Mohneys' product liability claims in light of the

---

**3.** In this case, it is not even arguable that the manufacturer defendants were simply sponsors. In summary judgment, we construe the facts and draw all inferences in favor of the Mohneys, the nonmovants. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). We take note that Levi testified that

he purchased his helmet and facemask. *See* J.A. at 250, 255 (Levi Dep.).

**4.** The parties did not include the October 22, 1997 Case Management Conference Order in the Joint Appendix but this Order was on file with the clerk's office.

district court's October 22, 1997 Order. The district court's conclusion that the "[p]laintiffs have identified no specific affirmative acts committed by either Karhu or Bauer that would give rise to a finding of willful or wanton misconduct," was based on findings stemming directly from the Mohneys' product liability claims. J.A. at 73 (D.Ct.Op.). For instance, the district court observed that "[i]t appears to be undisputed that there is no viable way to design a face mask and/or helmet to provide protection against spinal injuries while permitting hockey players sufficient freedom of movement to play the game effectively." J.A. at 73. The district court also identified the failure of the Mohneys to "suggest[ ] any way in which the helmet and/or face mask could have been designed to protect against the injuries Mohney suffered." J.A. at 73. In addition, the district court found that, "[a]ll of the record evidence indicates that helmets and face masks are not designed to protect players from neck or spinal injury. Plaintiffs have not proposed any viable helmet or face-mask design that would afford such protection." J.A. at 73. The district court continued. "The helmet and face mask were not designed to protect against spinal injury. Karhu and Bauer cannot be held liable for willful or wanton misconduct based on the failure of their products to do something they were not designed to do. Therefore, Karhu and Bauer's motions for summary judgment must be granted." J.A. at 74.

Because we hold that the release did not reach the manufacturer defendants in their role as manufacturers, the district court erred in considering the validity of the Mohneys' product liability claims under the standard of willful and wanton misconduct. To the extent the district court can be read as independently adjudicating the Mohneys' product liability claims, without giving the Mohneys a proper opportunity to discover and present evidence on these claims, it contravened the parameters imposed by its case management order. The Mohneys therefore never had a fair chance to establish a genuine issue of material fact as to their product liability claims. Accordingly, we REVERSE the district court's grant of summary judgment to Bauer and Karhu and REMAND to the district court to allow the Mohneys' product liability claims against the manufacturers to go forward.

G. Motion to Compel, Motion for Sanctions

■ The scope of discovery is within the discretion of the trial court. Accordingly, we review the denial of a motion to compel for an abuse of discretion. *See Lavado v. Keohane,* 992 F.2d 601, 604 (6th Cir.1993). On March 25, 1999, the Mohneys filed a motion to compel and motion for sanctions relating to the failure of USA Hockey to produce "approximately thirty (30) letters received by the [USA Hockey Body Checking] Task Force." J.A. at 874 (Pls.' Mot. to Compel, Mot. for Sanctions).[5] The district court denied the Mohneys' motions, concluding that they failed to comply with Local Rule 37.1 for the Northern District of Ohio which imposes in essence, three prerequisites to the filing of a motion to compel. First, counsel for the party seeking discovery must certify to the court "the making of[ ] sincere, good faith efforts to resolve such disputes." N.D. OHIO R. 37.1. Second. "[t]he Judicial Officer shall attempt to resolve the discovery

---

5. The Task Force's Report and Recommendation referenced these thirty letters, some of which "express a general concern about the state of hockey and body checking," while a majority of the letters "favor delaying or restricting the introduction of body checking." J.A. at 874 (Pls.' Mot. to Compel, Mot. for Sanctions).

dispute by telephone conference." *Id.* Third, if after the telephone conference, the discovery dispute has not yet been resolved, "the parties shall outline their respective positions by letter and the Judicial Officer shall attempt to resolve the dispute without additional legal memoranda." *Id.* Finally, if after consideration of the position letters, the Judicial Officer remains "unable to resolve the dispute, the parties may simultaneously file their respective memoranda in support of and in opposition to the requested discovery by a date set by the Judicial Officer, who may schedule a hearing on the motion to compel." *Id.*

Although the Mohneys submitted a letter to the District Judge dated October 7, 1999 explaining their good faith efforts to engage in discovery with USA Hockey and requesting the district court's assistance in resolving the discovery dispute, *see* J.A. at 1047 (Letter of Oct. 7, 1999 to D. Ct.), they filed their motion to compel and motion for sanctions before satisfying the local rule's three prerequisites. While we note that this is a highly technical application of a local rule, we nevertheless AFFIRM the district court's decision because it did not abuse its discretion in finding that the Mohneys failed to comply with the local rule.

### III

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment as to defendant Reneger and the hockey defendants. We REVERSE the district court's order granting summary judgment in favor of the manufacturer defendants and REMAND to the district court to allow the Mohneys' product liability claims against Bauer and Karhu to pro-

ceed. Finally, we AFFIRM the district court's partial grant of the hockey defendants' motions to strike and the denial of the Mohneys' motion to compel and motion for sanctions.