**Levi MOHNEY, et al., Plaintiff,**

v.

**USA HOCKEY, INC., et al., Defendant.**

**No. 3:97 CV 7417.**

United States District Court,
N.D. Ohio,
Western Division.

Dec. 14, 1999.

---

James R. Oates, Merrillville, IN, Fred C. Jug, Brandt, Milnes & Rea, Pittsburgh, PA, for Levi Mohney, plaintiff.

James R. Oates, Fred C. Jug, Brandt, Milnes & Rea, Pittsburgh, PA, for Mary Mohney, plaintiff.

James R. Oates, Fred C. Jug, Brandt, Milnes & Rea, Pittsburgh, PA, for Timothy Mohney, plaintiff.

Rudolph A. Peckinpaugh, Jr., Ann Jeannine Foeller, Eastman & Smith, Toledo, OH, for USA Hockey, Inc. aka Amateur Hockey Association of the United States, Inc., defendant.

Rudolph A. Peckinpaugh, Jr., Ann Jeannine Foeller, Eastman & Smith, Toledo, OH, for Toledo Cherokees Jr Club, Inc., dba Toledo Cherokees, defendant.

Rudolph A. Peckinpaugh, Jr., Ann Jeannine Foeller, Eastman & Smith, Toledo, OH, for Central States Hockey League, defendant.

William A. Viscomi, Ernest W. Auciello, Jr., Timothy P. Whitford, Gallagher, Sharp, Fulton & Norman, Cleveland, OH, Stephen D. Straus, Traub, Eglin, Lieberman & Straus, Mid–Westchester Executive Park, Hawthorne, NY, for Cooper of Canada Limited, dba Bauer, Inc., defendant.

Martin J. Witherell, Mary Ann Whipple, Mark A. Shaw, Fuller & Henry, Toledo, OH, for Jofa Face Masks dba Karhu USA, Inc., defendant.

David W. Doerner, Doyle, Lewis & Warner, Toledo, OH, William H. Bracy, John R. Kuhl, Wingart, Bracy & Kuhl, Toledo, OH, for Jason Reneger, Personally and as Agent and Player of the Toledo Cherokees, defendant.

## MEMORANDUM OPINION

KATZ, District Judge.

This matter is before the Court on separate motions for summary judgment filed by Defendant Jason Reneger ("Reneger") (Doc. No. 37), Defendants USA Hockey, Inc. ("USA Hockey"), Toledo Cherokees Jr. Club, Inc. ("Cherokees") and Central States Hockey League ("CSHL") (Doc. No. 41), Defendant Jofa Face Masks d/b/a Karhu USA, Inc. ("Karhu") (Doc. No. 42), Defendant Cooper of Canada, Ltd. d/b/a Bauer, Inc. ("Bauer") (Doc. No. 51); and on two motions of Defendants USA Hockey, the Cherokees and CSHL to strike certain materials filed in support of Plain-

tiffs' opposition to their motion for summary judgment (Doc. Nos. 90 & 147); and on Plaintiffs' motion to compel and for sanctions (Doc. No. 138).

For the following reasons, all of the motions for summary judgment will be granted. The motions to strike will be granted in part and denied in part. Plaintiffs' motion to compel and for sanctions will be denied.

### BACKGROUND

This action arises out of an accident that occurred in a space of a little over two seconds during an amateur hockey game. The lives of two young men were changed forever in the space of that short time. Plaintiff Levi Mohney ("Mohney") left the rink that day as a quadriplegic. Defendant Jason Reneger ("Reneger") left the rink scarred with the knowledge that he was involved in this most unfortunate action. No one touched by the incidents of that day can be unmoved by the tragedy of the collision.

Mohney brings this action to recover for physical injuries he suffered while participating in that game on May 21, 1995, one week prior to his eighteenth birthday. His parents, Timothy and Mary Mohney, bring claims for loss of consortium.

Mohney began ice skating when he was four years old and began to play ice hockey when he was six. He was an exceptionally good amateur player, and played in a number of traveling junior leagues as an adolescent. His goal was to play ice hockey professionally.

Defendant USA Hockey is the national governing body for amateur ice hockey in the United States. Defendant CSHL is a subdivision of USA Hockey and is responsible for overseeing teams in the central states region of the United States. USA Hockey requires all participants in any of its programs to sign an Individual Membership Registration ("IMR") form, which is valid from September 1 of the year it is signed to the following August 31, as a precondition to participation in the program. The form covers the registrant's participation in all USA Hockey-sanctioned events for the year. It contains a release of liability and provides for catastrophic medical insurance. The form provides, in relevant part, that:

> Upon entering events sponsored by USA Hockey and/or its member districts, I/We agree to abide by the rules of USA Hockey as currently published. I/We understand and appreciate that participation or observation of the sport constitutes a risk to me/us or serious injury, including permanent paralysis or death. I/We voluntarily and knowingly recognize, accept, and assume this risk and release USA Hockey, its Affiliates, their sponsors, event organizers and officials from any liability therefore [sic].

Mohney signed IMR forms for each of years 1991–92, 1992–93, 1993–94, and 1994–95. Since Mohney was a minor at the time, his father also signed each release form. Mohney and his father signed the release form covering the 1994–95 season in Indianapolis, Indiana, prior to trying out for a AAA team named the Indianapolis Amateur Ice.

Defendant Cherokees is a traveling Junior B amateur hockey team based in Toledo, Ohio, and is affiliated with USA Hockey. The Cherokees sponsor an annual development camp, held in May, for hockey players between the ages of sixteen and twenty. The development camp also assists the Cherokees in scouting and screening; players who play well at the development camp may be invited to try-outs for the team the following August. Mohney participated in the Cherokees' development camp, which was held at the Tam O'Shanter ice rink in Sylvania Township, Lucas County, Ohio, in 1994 and 1995.

The games at the Cherokees' development camp were played under National Hockey League ("NHL") rules, which are slightly different from USA Hockey rules, with regard to an infraction known as "icing the puck." Icing the puck occurs whenever any player of a team, equal or superior in numerical strength to the op-

posing team, shoots, bats, or deflects the puck from his own half of the ice beyond the goal line of the opposing team. NHL Official Rules, Rule 65(a). Under the NHL's "touch icing" rules, if a player of the side shooting the puck down the ice who is on-side and eligible to play the puck does so before it is touched by an opposing player, the play continues and no infraction is called. *Id.* Rule 65(b). USA Hockey uses a slightly different rule, which is known as "automatic icing." Under "automatic icing" rules, the icing infraction automatically occurs when the puck crosses the opposing team's goal line. USA Hockey Official Rules, Rule 620.

Thus, under "touch icing" rules, the players from both teams have an incentive to get to a loose puck as quickly as possible, either to cause or to prevent an icing infraction from being called. Under "automatic icing" rules, on the other hand, neither side has an incentive to chase the puck, since the infraction occurs regardless of which side gets to the puck first. One practical result of "touch icing" rules is an increase in the number of player collisions with the "boards" at the end of the rink, when players who are chasing the puck to the end of the rink are unable to stop in time to avoid contact with the boards. Because of the increased risk of player injury, "touch icing" is prohibited below the Junior B level. Mohney had played under "touch icing" rules only at the two Cherokees development camps, although he was familiar with the rule from watching NHL games.

On May 21, 1995, the second day of the Cherokees' 1995 development camp, the players were divided into two teams for scrimmages. Mohney was on the "white" team. Defendant Jason Reneger, who had played for the Cherokees during the 1994–95 season, was on the "red" team. During the first scrimmage, a player from the white team iced the puck by shooting it beyond the red team's goal line. Both Mohney and Reneger skated after the puck. Mohney cut in front of Reneger, Reneger fell into Mohney from behind, and both players lost control and collided with the boards at the end of the rink. The entire duration of the incident, from Mohney's collision with Reneger to the two players' collision with the boards, was a little over two seconds. No penalty was called on the play.

At the time of the accident, Mohney was wearing an SK 2000 L hockey helmet manufactured by Defendant Bauer, and a face mask manufactured by Defendant Karhu. The face mask was a cage type mask, which was held in place by two metal brackets. One of the clips holding the face mask broke off at the time Mohney's face struck the boards.

Mohney sustained severe spinal damage at the C5–C6 level. He is now quadriplegic as a result of his collision with the boards.

After the accident, Mohney applied for and received insurance benefits under the catastrophic medical coverage provided by USA Hockey.

Plaintiffs brought this suit against Reneger, USA Hockey, the CSHL, the Cherokees, Karhu, Bauer, and Reneger, to recover for Mohney's injuries. They claim that Reneger recklessly checked Mohney from behind in violation of the rules, causing his collision with the boards, that USA Hockey, the CSHL, and the Cherokees failed adequately to instruct the players about the dangers of checking from behind, and that "touch icing" rules used at the scrimmage are unreasonably dangerous. They bring products liability claims against Karhu and Bauer.

All of the defendants have moved for summary judgment. Plaintiffs have filed opposition to those motions, and Defendants have replied thereto. The Court heard oral argument on March 30, 1999, and received post-hearing briefs. A videotape of the accident has been filed as part of the evidentiary record. In accordance with this Court's Case Management Order entered on October 24, 1997, the parties have limited their briefing to the issues of (1) whether Plaintiffs' claims are barred by

express assumption of the risk, and (2) whether Plaintiffs' claims are barred by primary assumption of the risk.

Also pending before the Court are two motions by USA Hockey, the CSHL, and the Cherokees to strike certain evidentiary material proffered by Plaintiffs in their opposition to the motions for summary judgment. The Court must address those motions as a threshold matter, since the resolution of those motions will affect the evidence the Court may consider on the motions for summary judgment.

## MOTIONS TO STRIKE

The Federal Rules of Civil Procedure provide that all evidentiary material made in support of or in opposition to a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P. 56(e). Defendants USA Hockey, the CSHL, and the Cherokees (collectively, "the Hockey Defendants") argue that the following materials do not comply with the strictures of Rule 56(e):

1. The Hockey Defendants have moved to strike paragraphs 8–16 of the affidavit of Plaintiffs' expert Steve Bernheim. (Doc. No. 73, Ex. A). Bernheim has been an NHL official for over twenty-five years. The Hockey Defendants do not challenge Bernheim's qualifications to testify as an expert on the rules of ice hockey. In paragraphs 8–16 of his affidavit, Bernheim opines that Reneger should have been charged with a penalty for checking from behind in the collision that caused Mohney's injuries, and that USA Hockey should have provided Mohney with more information about the increased risk of injury caused by "touch icing" rules.

■ In paragraphs 8 and 13–16 Bernheim states that he disagrees with the opinions of Defendants' experts that the accident was unavoidable and Reneger should not have been charged with a penalty. The Hockey Defendants argue that those paragraphs must be stricken under

the rule that a mere statement that an affiant disagrees with the statements contained in another party's affidavit does not create a triable issue of fact. *See Baxter v. Railway Express Agency, Inc.*, 455 F.2d 693, 696 (6th Cir.1972).

While the Hockey Defendants' general statement of the law is correct, the Court disagrees that it mandates the striking of paragraphs 8 and 13–16. Bernheim's assertion that he disagrees with Plaintiffs' experts' opinions is not a mere conclusory statement, but is supported by factual assertions Bernheim makes at other portions of the affidavit and in the attached letter. Therefore, paragraphs 8 and 13–16 will not be stricken.

■ In paragraph 9, Bernheim authenticates an attached letter summarizing his expert report. The Hockey Defendants argue that the attached letter, which is not signed under penalties of perjury, is inadmissible hearsay.

The Court disagrees that such matter must be stricken. It is true that it would have been, technically, more correct for Bernheim either (a) expressly to incorporate the allegations in the letter, under penalties of perjury, or (b) to restate the determinations he makes in his letter in the body of the affidavit himself. However, at the summary judgment stage, the focus is not on the form of the evidence as it is presented in the affidavit, but rather, whether at trial the matter stated in the affidavit would constitute admissible evidence. As long as it is clear at the time of the summary judgment motion that the evidence could be subsequently put into admissible form at trial, little would be gained by requiring the nonmovant to take the time and effort to restructure the evidence at the summary judgment stage. 11 JAMES WM. MOORE, ET AL., MOORE'S FEDERAL PRACTICE § 56.14[1][d] (3d ed.1997); EDWARD BRUNET, SUMMARY JUDGMENT MATERIALS, 147 F.R.D. 647, 656–67 (1993). It is clear from the content and structure of Bernheim's affidavit that he intended to incorporate the attached letter into his af-

fidavit. Therefore, that attached letter will not be stricken.

The Hockey Defendants have moved to strike paragraphs 10–14 as setting forth improper conclusions unsupported by specific facts. Bernheim provides the facts to support those conclusions in his attached letter, which this Court has ruled admissible. Those paragraphs will not be stricken.

In paragraph 12, Bernheim states that Mohney had limited experience with "touch icing" and that USA Hockey should have warned him of the increased risk of injury. The Hockey Defendants have moved to strike that paragraph for lack of personal knowledge.

No showing has been made that Bernheim had personal knowledge that Mohney lacked experience with "touch icing." Bernheim's statement is not admissible to show that Mohney lacked experience with "touch icing."[1] The statement is admissible as an expert opinion that hockey players who lack experience with "touch icing" should be warned of the increased risk of injury posed by that rule.

No portion of Bernheim's affidavit will be stricken, although Bernheim's assertion that Mohney lacked experience with "touch icing" rules cannot be considered for the truth of the assertion.

2. The Hockey Defendants have moved to strike the entire affidavit of Plaintiffs' expert John Hanst, a forensic investigator of recreational hazards. (Doc. No. 73, Ex. B.) They argue that Hanst has no personal knowledge of the facts to which he has testified, and that Plaintiffs have not sufficiently demonstrated that Hanst is qualified to testify as an expert.

In paragraphs 5–10, 13, and 15–17 of his affidavit, Hanst opines that Reneger's conduct violated the rules of hockey, and that the development camp demonstrated inadequate concern for player safety. The Court has reviewed Hanst's curriculum vitae. It contains no information from

which this Court can infer that Hanst is an expert on the rules of ice hockey or in the organization of hockey development camps. Therefore, the Court finds that Hanst is not qualified to testify as an expert on those matters, and that matter must be stricken.

In paragraphs 11–12, 14 and 18 of his affidavit, Hanst opines that the release form signed by Mohney and covering the 1994–95 season is not enforceable. Hanst's curriculum vitae contains no information from which this Court can infer that Hanst is qualified to render a legal opinion, and expert opinions as to legal conclusions are not admissible in any case. Therefore, that matter must be stricken.

The remaining material in Hanst's affidavit consists of background information about Hanst which is not relevant to this case in the absence of admissible opinions from him. Accordingly, Hanst's entire affidavit will be stricken.

3. The Hockey Defendants have moved to strike paragraphs 6–11, 14–18, and 20–22 of the affidavit of Robert Gergerich. (Doc. No. 73, Ex. C.) Gergerich is the proprietor and director of International Hockey College. The Hockey Defendants do not challenge Gergerich's qualifications to testify as an expert on the rules of ice hockey. Gergerich opines that Reneger should have been charged with a penalty for checking from behind in the collision that caused Mohney's injuries, that "touch icing" presents an increased risk of injury, and that USA Hockey should have provided Mohney with more information about the increased risk of injury caused by "touch icing" rules.

The Hockey Defendants have moved to strike paragraphs 6–11, 16–18, and 20–22 on the ground that they set forth improper conclusions unsupported by specific facts. The Court disagrees. The opinions Gergerich gives in those paragraphs are the sort of opinions that may be given by an ex-

1. As a factual matter, it appears to be undisputed that Mohney had a total of three days' experience playing under "touch icing" rules at the time of the collision.

pert, and the factual underpinnings for his opinions are evident in other portions of his affidavit.

The Hockey Defendants have moved to strike paragraphs 8, 9, and 16 on the ground of lack of personal knowledge. In paragraph 8, Gergerich states that Mohney had limited experience with "touch icing;" no showing has been made that Gergerich had personal knowledge regarding Mohney's experience with "touch icing," so that testimony cannot be considered for its truth. All of the remaining material contained in those three paragraphs consists of either (a) information Gergerich would have known as an expert in the field of ice hockey, or (b) information Gergerich could have gleaned by viewing the videotape of the accident. That material will not be stricken.

The Hockey Defendants have moved to strike paragraphs 9 and 20 as hearsay. The first out-of-court statements alluded to in those paragraphs is admissible as material reasonably relied upon by an experts in the field of ice hockey. *See* Fed. R.Evid. 703. The second out-of-court statement is a party admission, taken directly from the deposition of a party to this case, and may be relied upon by an expert as such. That material will not be stricken.

The Hockey Defendants have moved to strike paragraph 14 as setting forth a legal opinion. Paragraph does not express an opinion at all; Gergerich merely states that he viewed the videotape of the collision. That material will not be stricken.

The Hockey Defendants have moved to strike paragraphs 15 and 17 as being conclusory disagreements with the Hockey Defendants' experts' opinions. The Court disagrees. Gergerich is qualified to offer an expert opinion, and has supported that opinion with facts elsewhere in his affidavit.

The Hockey Defendants have moved to strike paragraphs 16 and 22 as speculative. The Court disagrees. Those paragraphs consist of legitimate expert opinions, and

Gergerich reasonably expresses the factual bases therefor.

The Hockey Defendants have moved to strike paragraph 21 as irrelevant. In paragraph 21, Gergerich opines that the collision was avoidable. That is not irrelevant.

No portion of Gergerich's affidavit will be stricken, although Gergerich's assertion that Mohney lacked experience with "touch icing" rules cannot be considered for the truth of the assertion.

4. The Hockey Defendants have moved to strike paragraphs 2–10, 12–14, 18–19, 21–24, and 26–28 of the affidavit of Levi Mohney, on various grounds including relevancy, lack of personal knowledge, and hearsay. (Doc. No. 73, Ex. D.) The Court has reviewed the affidavit. Paragraphs 4, 10, 11, 13, 14, and portions of paragraph 18 contain statements of fact attributed to third parties. Those paragraphs must be stricken for lack of personal knowledge and/or hearsay. Paragraph 19 contain legal conclusions that Mohney is not competent to give, and must be stricken. The remainder of Mohney's affidavit is admissible. Paragraphs 4, 10, 11, 13, 14, 18, and 19 of Mohney's affidavit will be stricken.

5. The Hockey Defendants have moved to strike paragraph 4 of the affidavit of Daniel A. Funk, M.D. on the ground that it gives inadmissible evidence of a subsequent remedial measure. (Doc. No. 73, Ex. E.) The Court disagrees. The paragraph at issue makes no reference to remedial measures at all. It is true that Funk makes brief reference to a brochure on spinal safety that was published after Mohney's injury, but no description of any subsequent remedial measure taken by USA Hockey or any other entity is given. No portion of Funk's affidavit will be stricken.

6. The Hockey Defendants have moved to strike paragraphs 3, 5–6, and 8–15 of the affidavit of Timothy Mohney on grounds including relevancy, lack of personal knowledge, and hearsay. (Doc. No.

73, Ex. F.) The Court has reviewed the affidavit. All portions of the affidavit appear to be made on personal knowledge. No portion of Timothy Mohney's affidavit will be stricken.

7. The Hockey Defendants have moved to strike paragraphs 8–9 and 11–14 of the affidavit of Mary Mohney on grounds including relevancy, lack of personal knowledge, and hearsay. (Doc. No. 73, Ex. G.) The Court has reviewed the affidavit. Paragraphs 12–14 contain opinion evidence that Mary Mohney is not competent to give, since there is no evidence that she is qualified as an expert in ice hockey. The remainder of the affidavit is admissible. The portions of paragraphs 12–14 in which Mary Mohney gives opinion testimony about responsibility for the collision that led to Mohney's injuries will be stricken.

8. The Hockey Defendants have moved to strike Exhibits K–M attached to Plaintiffs' Notice of Filing Affidavit and Discovery Responses. (Doc. No. 73.)

Exhibit K is a "Heads Up—Don't Duck" brochure prepared by Mid–American District Hockey, an affiliate of USA Hockey, after Mohney's accident. The Hockey Defendants have moved to strike the brochure on the grounds that it is hearsay, and that it constitutes a subsequent remedial measure. The Court agrees that the document constitutes hearsay, and that it does not fall into any exception to the hearsay rule. Exhibit K will be stricken.

Exhibits L and M are medical records from Flower Hospital. Plaintiffs have moved to strike both exhibits on the ground that they are hearsay. The documents at issue may be considered in a summary judgment motion. It is clear that the matter contained in the documents could easily be put into admissible form at trial. Furthermore, it appears that much of the material contained therein would be admissible under Fed.R.Evid. 803(4) or (6). Exhibits L and M will not be stricken.

9. The Hockey Defendants have moved to strike the affidavit of attorney Fred C. Jug. (Doc. No. 123.) The affidavit summarizes the contents of Dr. Alan Ashare's article, the videotape entitled "Smart Hockey with Mike Bossy," and portions of Levi Mohney's deposition. This is not appropriate subject matter for an affidavit submitted by a party's counsel. First, the materials are hearsay when presented by a third party for the truth of the matter contained therein. Second, it is highly inappropriate for an attorney to act as a witness in a case he is trying. Counsel is free to make all of the arguments he includes in his affidavit in the *argument* portion of a *brief,* but he cannot vouch for the truth of the matter asserted as a witness by means of affidavit. The materials cited by counsel must stand or fall on their own merits. All portions of Jug's affidavit that describe the contents of evidentiary materials will be stricken.

10. The Hockey Defendants have moved to strike the affidavit of attorney James R. Oates and attached transcript of the videotape entitled "Smart Hockey with Mike Bossy." (Doc. No. 132.) The affidavit merely attests that the transcript is accurate, and will not be stricken. The videotape transcript itself constitutes inadmissible hearsay, and cannot be considered for the truth of the matter asserted therein. It is admissible, however, to show that the Hockey Defendants were on notice of the risk of spinal injuries posed by ice hockey, and that educational materials about avoiding spinal injuries were available at the time of Mohney's injury.

11. The Hockey Defendants have moved to strike the affidavit of Plaintiffs' expert Kevin Stubbington. (Doc. No. 126.) Stubbington is Vice–President of the Windsor, Ontario, Minor Hockey Association and is a former referee. In paragraphs 4–12 of his deposition, Stubbington describes an ice hockey safety program known as the Safety Towards Other Players ("S.T.O.P.") program that has been used in Canada since April, 1995. The Hockey Defendants claim those paragraphs give evidence of a subsequent remedial measure. The Court disagrees.

First, the S.T.O.P. program is not a *subsequent* measure; it was instituted prior to Mohney's accident. Second, there is no evidence whatsoever that USA Hockey or the Cherokees ever instituted the program; thus, it cannot be a remedial measure. Testimony concerning the S.T.O.P. program is nothing more or less than evidence tending to show that additional precautionary measures would have been feasible in this case. *See* Fed.R.Evid. 407. As such, it is admissible.

The Hockey Defendants have moved to strike paragraph 16 of Stubbington's deposition on the ground that it mischaracterizes the deposition testimony of the Hockey Defendants' expert Ronald Tallman. Of course, Stubbington's description of Tallman's deposition testimony cannot be considered for its accuracy as to Tallman's deposition, but the material is admissible to the extent that Stubbington is establishing a basis for his own expert opinion.

The Hockey Defendants argue that paragraphs 17–18 contain unsupported conclusions and are irrelevant. The Court disagrees. In paragraphs 17–18, Stubbington opines that a penalty should have been called on Reneger, and explains the bases for his opinion. That material is admissible.

In paragraph 19, Stubbington summarizes some of the information that was provided to him in connection with the preparation of his expert report. His assertions as to the accuracy of that underlying information cannot be considered for their truth, since he lacks personal knowledge of that information. However, Stubbington can use that information in forming the basis of his expert opinions in accordance with Fed.R.Evid. 703.

In paragraph 20, Stubbington describes an educational videotape that is used in connection with the S.T.O.P. program. That material is admissible to show the feasibility of precautionary measures.

In paragraphs 21–23, Stubbington discusses his involvement with the case at bar. The Hockey Defendants have moved to strike those paragraphs on the ground

of relevancy. The Court disagrees. It is common for expert witness affiants to provide background information about themselves in their affidavits, and such information often includes information about whether the expert witness is being paid for his testimony. No portion of Stubbington's affidavit will be stricken.

12. The Hockey Defendants have moved to strike the affidavit and attached article of Charles H. Tator, M.D. (Doc. No. 125.) The article is entitled *Spinal Injuries in Ice Hockey Players, 1966–1987* and was published in February, 1991. Tator's article constitutes inadmissible hearsay, and cannot be considered for the truth of the matter asserted therein. It is admissible, however, to show that Defendants were on notice of the risk of spinal injuries posed by ice hockey.

13. The Hockey Defendants have moved to strike the affidavit of Mohney's high school hockey coach Joseph Honzo on the ground of relevance. (Doc. No. 127.) The Court agrees that Honzo's affidavit must be stricken. It contains no information from which the Court can infer that Honzo had any connection with USA Hockey, or has any personal knowledge of the accident that would be relevant to this case.

14. The Hockey Defendants have moved to strike an unnamed March 28, 1996 article of Dr. Alan Ashare. The Court has reviewed the entire record in this case and is unable to find any article by Ashare showing that date. The record does contain an article dated entitled *Cervical Spine Injury: A Personal Perspective,* and dated January 16, 1996. (Doc. No. 121, no exhibit number given.) The Court will address the admissibility of that article on the assumption that the January 16, 1996 article is the one the Hockey Defendants intended to reference.

Ashare's article constitutes inadmissible hearsay, and cannot be considered for the truth of the matter asserted therein. Since it is dated after the accident, it is not admissible to show that Defendants were on notice of the risk of spinal injuries

posed by ice hockey. Ashare's January 16, 1996 article will be stricken.

15. The Hockey Defendants have moved to strike the October 16, 1996 article of Dr. Alan Ashare, entitled *Cervical Spine Injury and. Paralysis in Ice Hockey.* (Doc. No. 121, Ex. 1.) Ashare's article constitutes inadmissible hearsay, and cannot be considered for the truth of the matter asserted therein. Since it is dated after the accident, it is not admissible to show that the Hockey Defendants were on notice of the risk of spinal injuries posed by ice hockey. Ashare's October 16, 1996 article will be stricken.

16. The Hockey Defendants have moved to strike a report on spinal injuries prepared at the behest and for the benefit of USA Hockey, which is attached as Exhibit C to Plaintiffs' Supplemental Memorandum, on the ground that it is inadmissible hearsay. (Doc. No. 117, Ex. C.) The Court agrees. The document is hearsay, and Plaintiffs have not even argued that any exception to the hearsay rule applies, nor have they argued that the documents should be admitted for any purpose other than the truth of the assertions they contain. Exhibit C will be stricken.

17. The Hockey Defendants have moved to strike the "Smart Hockey with Mike Bossy" videotape. The videotape constitutes inadmissible hearsay, and cannot be considered for the truth of the matter asserted therein. It is admissible, however, to show that the Hockey Defendants were on notice of the risk of spinal injuries posed by ice hockey, and that educational materials about avoiding spinal injuries were available at the time of Mohney's injury.

■ 18. The Hockey Defendants have moved to strike the "Body Checking Task Force Executive Summary" attached to Dr. Alan Ashare's deposition on the ground that it is inadmissible hearsay. (Doc. No. 121, Ex. 7.) Several members of the Task Force were USA Hockey employees. An out-of-court statement is not hearsay, and may be considered for its truth, when it is offered against a party

and is a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship. Fed.R.Evid. 801(d)(2)(D). The Executive Summary appears to meet the criteria of that rule, and, as such, is defined as non-hearsay. The "Body Checking Task Force Executive Summary" will not be stricken.

For the foregoing reasons, The Hockey Defendants' motions to strike are granted in part and denied in part, as set forth in this Memorandum Opinion.

### MOTIONS FOR SUMMARY JUDGMENT

As an initial matter, the Court sets forth the relative burdens of the parties once a motion for summary judgment is made. Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Of course, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. at 2553. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (*quoting* Fed.R.Civ.P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. Summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c).

■■ This diversity action arises under the laws of the state of Ohio. In construing questions of state law, the District Court sits as a state court, and must apply state law in accordance with the controlling decisions of the highest court of the state. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). If the state's highest court has not addressed the issue, the District Court must attempt to ascertain how that court would rule if it were faced with the issue. The Court may use the decisional law of the state's lower courts, other Federal Courts construing state law, restatements of law, law review commentaries, and other jurisdictions on the "majority" rule in making this determination. *Grantham & Mann v. American Safety Prods.*, 831 F.2d 596, 608 (6th Cir. 1987). A Federal Court should not disregard the decisions of intermediate appellate state courts unless it is convinced by other persuasive data that the highest court of the state would decide otherwise. *Commissioner v. Estate of Bosch*, 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1967).

### Assumption of Risk in Recreational Activities

■ As a general rule, persons have a duty to use due care to avoid injury to others, and may be held liable if their careless conduct injures another person. In the sports setting, however, conditions or conduct that might be viewed as dangerous often are an integral part of the sport itself. "Injuries are a regular occurrence in many sports, such as football and hockey. Moreover, one who plays baseball, tennis, volleyball, soccer, basketball, or golf is subjected to risk of harm from balls struck or thrown travelling at considerable speed." *Thompson v. McNeill*, 53 Ohio St.3d 102, 559 N.E.2d 705, 707 (1990). For this reason, Ohio, like most states, has adopted the rule that "where individuals engage in recreational or sports activities, they assume the ordinary risks of the activity and cannot recover for any injury unless it can be shown that the other participant's actions were either reckless or intentional." *Marchetti v. Kalish*, 53 Ohio St.3d 95, 559 N.E.2d 699, 703–04 (1990).

The phrase "assumption of risk" describes at least two distinct legal concepts: primary assumption of risk and secondary assumption of risk.[2] Primary assumption of risk refers to those instances where there is no duty on the part of the defendant to protect the plaintiff from a particular risk. Notwithstanding the fact that courts generally discuss assumption of risk in plaintiff-oriented terms—such as by saying that a plaintiff has assumed the risk of a certain activity—primary assumption of risk is actually defined by reference to the defendant. The question whether the defendant has a legal duty to protect the plaintiff from a particular risk of harm turns solely on the nature of the activity in which the defendant is engaged and the relationship of the defendant and the plaintiff to that activity or sport. *See Marchetti*, 559 N.E.2d at 703; *Knight v. Jewett*, 3 Cal.4th 296, 11 Cal.Rptr.2d 2, 834 P.2d 696, 704 (1992).

An example will clarify this rule. It is well known in the United States that attending professional baseball games entails a risk of being hit by a baseball inadvertently batted into the stands, and that patrons of ballparks assume the risk of

---

**2.** For a general discussion of these concepts, see Prosser & Keeton on Torts § 68 (5th ed.1984); 2 Harper & James, The Law of Torts § 21.1 (1st ed.1956)

such injuries. Suppose a Swedish visitor who has never seen a baseball game and does not know of the risk is hit by a foul ball The fact that the Swede did not know of the risk does not alter the ballpark's duty.[3] Any other rule would change the ballpark's duty on the basis of factors out of its control, and could lead to anomalous results. Thus, assumption of risk in the context of sports and recreational activities is *primary* assumption of risk.

Secondary assumption of risk, on the other hand, refers to those instances where the defendant does owe a duty of care to the plaintiff but the plaintiff *knowingly* encounters a risk of injury caused by the breach of that duty. In those cases, the plaintiff is barred from recovery only if he was unreasonable in encountering the risk under the circumstances. In most modern jurisdictions, cases involving secondary assumption of risk have been merged into comparative negligence systems. Secondary assumption of risk is not an issue in the case at bar.

■■■ A third liability-limiting principle that is relevant to this case is express assumption of risk. Express assumption of risk is a contract-based species of primary assumption of risk, in which "the plaintiff, in advance, gives express consent to relieve the defendant of an obligation of conduct toward him. . . . The result is that the defendant is relieved of legal duty to the plaintiff; and being under no duty, he cannot be charged with negligence." Prosser & Keeton on Torts § 68 (5th ed.1984). It is well established under Ohio law that "[a] participant in a recreational activity is free to contract with the proprietor of such activity so as to relieve the proprietor of responsibility for damages or injuries to the participant caused by the negligence of the proprietor, except when caused by willful or wanton conduct." *Cain v. Cleveland Parachute Training Ctr.,* 9 Ohio App.3d 27, 457 N.E.2d 1185,

1187 (1983); *accord Pippin v. M.A. Hauser Enters., Inc.,* 111 Ohio App.3d 557, 676 N.E.2d 932, 936 (1996).

■■■ If either primary or express assumption of risk applies to Mohney's claims against any of the named defendants, those defendants can be liable only if they are guilty of willful or wanton misconduct. What constitutes willful or wanton misconduct in the context of a sport or recreational activity must be determined with reference to the rules and customs of the sport in question. *Thompson,* 559 N.E.2d at 708. The mere fact that a safety rule of the game has been broken is not sufficient to establish willful or wanton misconduct, if the violation of that rule is foreseeable under the circumstances of the game. *See, e.g., McKichan v. St. Louis Hockey Club, L.P.,* 967 S.W.2d 209 (Mo.Ct. App.1998); *Savino v. Robertson,* 273 Ill. App.3d 811, 210 Ill.Dec. 264, 652 N.E.2d 1240 (1995); *Marchetti,* 559 N.E.2d at 700; *Gauvin v. Clark,* 404 Mass. 450, 537 N.E.2d 94 (1989). Rather, liability is imposed only if the defendant engages in reckless conduct that is totally outside the range of the ordinary activity involved in the sport. *Knight,* 11 Cal.Rptr.2d 2, 834 P.2d at 710. The California Supreme Court, which has adopted the same rule as Ohio, has explained that:

> in the heat of an active sporting event . . . a participant's normal energetic conduct often includes accidentally careless behavior . . . [V]igorous participation in such sporting events likely would be chilled if legal liability were to be imposed on a participant on the basis of his or her ordinary careless conduct . . . [E]ven when a participant's conduct violates a rule of the game and may subject the violator to internal sanctions prescribed by the sport itself, imposition of legal liability for such conduct might well alter fundamentally the nature of

---

**3.** The example is taken from Restatement (Second) of Torts § 496C cmt. g, illus. 4 (1965), which comes to the opposite conclusion. Courts have consistently rejected the

Restatement's position. *See, e.g., Brown v. San Francisco Ball Club,* 99 Cal.App.2d 484, 222 P.2d 19 (1950).

the sport by deterring participants from vigorously engaging in activity that falls close to, but on the permissible side of, a prescribed rule.

*Id; accord Savino,* 210 Ill.Dec. 264, 652 N.E.2d at 1245: *Marchetti,* 559 N.E.2d at 703; *Gauvin,* 537 N.E.2d at 97. Courts have also expressed concerns that allowing a lesser standard for liability could "open a legal pandora's box, allowing virtually every participant in a contact sport ... to bring an action based on the risks inherent in virtually every contact sport." *Savino,* 210 Ill.Dec. 264, 652 N.E.2d at 1245; *see also Marchetti,* 559 N.E.2d at 702.

With these concepts in mind, the Court turns to the facts of the case at bar.

### APPLICATION TO THE CASE AT BAR

All of the Defendants except Jason Reneger have moved for summary judgment on the ground that Levi Mohney expressly assumed the risk of his injuries by signing the Individual Membership Registration form for the 1994–95 season, which form expressly provided that:

> Upon entering events sponsored by USA Hockey and/or its member districts, I/We agree to abide by the rules of USA Hockey as currently published. I/We understand and appreciate that participation or observation of the sport constitutes a risk to me/us or serious injury, including permanent paralysis or death. I/We voluntarily and knowingly recognize, accept, and assume this risk and release USA Hockey, its Affiliates, their sponsors, event organizers and officials from any liability therefore [sic].

If that release is enforceable, the Defendants covered by the release can be liable to Mohney only if they are found to have committed willful or wanton misconduct. Defendant USA Hockey is expressly named on the release form. Defendants CSHL and Cherokees are affiliates of USA Hockey. Defendants Karhu and Bauer are sponsors of USA Hockey. They argue that the plain language of the release covers them, and that the release is enforceable as a matter of law.

It is not disputed in this case that both Mohney and his father signed the IMR form at the beginning of the 1994–95 season. It is also clear under Ohio law that such releases of liability are valid, and that a parent can bind a minor child to an exculpatory agreement in favor of volunteers and sponsors of nonprofit sport activities where the cause of action sounds in negligence. *Zivich v. Mentor Soccer Club, Inc.,* 82 Ohio St.3d 367, 696 N.E.2d 201, 207 (1998).

Despite the plain language of the release, and the undisputed fact that both Mohney and his father signed the release, Plaintiffs have put forth several reasons why the release should not be enforced against them in this case.

First, Plaintiffs argue that the 1994–95 release Mohney and his father signed in Indianapolis, Indiana did not cover a game played in Toledo, Ohio after the regular season ended. They claim that the release specified that it was for "local program use only," and that it was valid only for the duration of the regular hockey season, which ended on March 5, 1995.

Plaintiffs' first argument lacks merit. Defendants have submitted unrebutted testimony that the IMR form both is valid from September 1 of the year it is signed until the following August 31, and covers the registrant's participation in all USA Hockey-sanctioned events for the year. The "local program use only" notation does not indicate a geographic restriction to the coverage of the release. It is part of a "do not write in this area" notation on the IMR, indicating only that the applicant should not write in that section of the form. Nor is there any indication on the IMR that it ceases to be in effect after the end of the regular hockey season. Mohney signed similar forms in each of years 1991–1994, and was on notice that the forms covered the entire year.

Second, Plaintiffs argue that the release should not apply to his product liability claims against Karhu and Bauer because those claims are premised on strict liability, rather than negligence, and because the

IMR does not expressly mention the equipment manufacturers.

Those arguments also lack merit. First, since strict liability requires a *lesser* showing of culpability than does negligence, it stands to reason that if a plaintiff can waive a negligence claim, he can also waive a strict liability claim. Plaintiffs have offered no argument that would support a conclusion that public policy forbids a plaintiff from waiving strict liability claims. Second, the fact that Karhu and Bauer are not mentioned by name on the IMR form is not dispositive. There is no dispute that Karhu and Bauer are sponsors of USA Hockey, and, as such, are expressly included in the category of persons against whom all liability claims are waived.

Furthermore, the Ohio Supreme Court's reasoning in *Zivich* mandates a finding that the IMR protects sponsors who donate equipment to entities such as USA Hockey. The *Zivich* Court explained that:

> volunteers in community recreational activities serve an important function.... Due in great part to the assistance of volunteers, nonprofit organizations are able to offer these activities at minimal cost.... [W]ithout the work of its [sic] volunteers, these nonprofit organizations could not exist, and scores of children would be without the benefit and enjoyment of organized sports. Yet the threat of liability strongly deters many individuals from volunteering for nonprofit organizations.... [A]lthough volunteers offer their services without receiving any financial return, they place their personal assets at risk.
>
> Therefore, faced with the very real threat of a lawsuit, and the potential for substantial damage awards, nonprofit organizations and their volunteers could very well decide that the risks are not worth the effort. Hence, invalidation of exculpatory agreements would reduce the number of activities made possible through the uncompensated services of volunteers and their sponsoring organizations.

*Zivich,* 696 N.E.2d at 205 (citations omitted). Although the *Zivich* Court's discussion focused primarily on the need to protect individual volunteers from the risk of liability, the reasoning applies with equal force to organizational volunteers. The Ohio Supreme Court could as easily have reasoned that sports equipment manufacturers, such as Karhu and Bauer, who donate equipment to community recreational activities serve an important function. Due in great part to the equipment donations of sponsoring sports equipment manufacturers, nonprofit organizations are able to offer recreational activities at minimal cost. Yet the threat of liability could deter many manufacturers from donating their products to nonprofit organizations. Although the manufacturers offer their products without receiving any financial return, they place their corporate assets at risk. Therefore, faced with the very real threat of a lawsuit, and the potential for substantial damage awards, sports equipment manufacturers could very well decide that the risks are not worth the effort. Hence, invalidation of exculpatory agreements would reduce the number of activities made possible through the uncompensated donations of sports equipment by sponsoring organizations. Karhu and Bauer are protected by the IMR form to the same extent as the other persons and entities covered by that form.

Third, Plaintiffs argue that the release is unenforceable for lack of consideration. That argument lacks merit as well. The fact that Mohney was permitted to play was sufficient consideration to support the release. *See Zivich,* 696 N.E.2d at 207.

Next, Plaintiffs argue that the release is unenforceable on grounds of vagueness. They argue that the IMR form did not make it clear that they were giving up their right to sue if Mohney should be injured. The Court disagrees. The language in the IMR at issue is virtually identical to the language the Ohio Supreme Court found enforceable in *Zivich.*[4]

4. The release in *Zivich* contained the lan-　guage: "I hereby release, discharge and/or

Furthermore, it is difficult to imagine a clearer release of liability than the language "I/We voluntarily and knowingly ... release USA Hockey, its Affiliates, their sponsors, event organizers and officials from any liability" that appeared in the IMR at issue.

Next, Plaintiffs argue that the release is unenforceable because Mohney did not read the document carefully and its contents were not explained to him. That argument lacks merit. A person who signs a contract cannot avoid the effect of the contract by citing ignorance of the contract's contents or a failure to understand those contents. *Pippin*, 676 N.E.2d at 937. The release language appeared plainly on the face of a one-page form, in what appears to be 13–point type. It was not hidden in an obscure part of the contract. No allegation of fraud has been made. Therefore, Mohney's allegations that he did not understand the contents of the release are insufficient to raise a question of fact as to whether he can avoid the effect of the release.

Next, Plaintiffs argue that the public policy considerations that underlay the Ohio Supreme Court's decision in *Zivich*, upholding exculpatory agreements in the context of amateur sports, do not support a holding that USA Hockey should be able to benefit from such a release because USA Hockey is the national governing body for amateur ice hockey throughout the United States, with a statutory duty to encourage the dissemination of information in the area of sports safety, *see* 36 U.S.C. § 392(a)(9), whereas the soccer club in *Zivich* was a small, local organization. The Court disagrees.

The sports organizations involved in *Zivich* and the case at bar are similarly situated. In both cases, the injured minor was a participant in a contest sponsored by a local sports organization that was affiliated with a national governing body. *See* 696 N.E.2d at 202. In both cases, the organizations were staffed almost exclusively with volunteers. *See id.* at 205. In fact, *Zivich* expressly makes reference to nonprofit sports organizations that are national in scope. *Id. Zivich* holds that an exculpatory agreement signed by a minor's parent on behalf of that minor acts as a bar to that minor later suing a nonprofit sports organization to recover for injuries that are within the scope of the exculpatory agreement. Nothing in the *Zivich* opinion indicates that its holding should be limited to nonprofit sports organizations that are local in scope.

Plaintiffs also argue that the exculpatory agreement does not bind Mary Mohney because she did not sign it. Under Ohio law, a plaintiff cannot contractually waive an otherwise valid right of action for loss of consortium held by his relative. *Bowen v. Kil–Kare, Inc.*, 63 Ohio St.3d 84, 585 N.E.2d 384, 392 (1992).[5] Where one parent of a minor signs an exculpatory agreement releasing the defendant from liability for injuries to that minor, the minor's other parent is bound by the exculpatory agreement if she has "accepted and enjoyed the benefits of the contract." *Zivich*, 696 N.E.2d at 207. It is clear from the record that Mary Mohney supported her son's participation in ice hockey. Not only did she permit him to play, the family was prepared to move to Toledo if Mohney successfully joined the Cherokees team. Mary Mohney was at the ice rink at the time of Mohney's injury. Thus, she is barred from disaffirming the

---

otherwise indemnify the Mentor Soccer Club and the USYSA, its affiliated organizations and sponsors, their employees, and associated personnel, including the owners of the fields and facilities utilized by the Soccer Club, against any claim by or on behalf of the registrant as a result of the registrant's participation in the Soccer Club." *Zivich*, 696 N.E.2d at 203.

5. Of course, the loss of consortium claim is still derivative in the sense that the claim is dependent on the defendant's having committed a legally cognizable tort upon the individual who suffers injury. *Bowen v. Kil–Kare, Inc.*, 63 Ohio St.3d 84, 585 N.E.2d 384, 392 (1992).

release under the doctrine of estoppel by acquiescence. *Id.*

Defendants USA Hockey, CSHL, the Cherokees, Karhu, and Bauer are covered by the terms of a valid release under which they can be liable to Mohney only if they are found to have committed willful or wanton misconduct.

Defendant Jason Reneger is not covered by the exculpatory agreement. However, under the doctrine of primary assumption of the risk, Reneger, too, can be liable to Mohney only if he is found to have committed willful or wanton misconduct totally outside the range of the ordinary activity involved in the sport of ice hockey.

### DEFENDANT JASON RENEGER'S MOTION FOR SUMMARY JUDGMENT

■ Defendant Jason Reneger has moved for summary judgment on the ground that no reasonable jury could find him to have committed willful or wanton misconduct in connection with Mohney's injury. In support, he has submitted three affidavits from hockey referees, in which those referees opine that Reneger's actions were within the rules of hockey, and that Reneger did nothing deserving of a penalty. A videotape of the collision has also been filed with the Court. Mohney has responded by filing affidavits from some other hockey referees who opine that a penalty should have been called on the play. None of Mohney's experts go so far as to state that Reneger's actions appear to have been reckless or intentional.

The Court has read the affidavits and has reviewed the videotape several times. The videotape shows Mohney and Reneger skating toward a loose puck at the end of the rink, paralleling each other, with Mohney on the left. Both players were skating at top speed. About two-thirds of the way down the rink, Mohney skated a few feet ahead of Reneger and cut into his path, about one pace ahead of him. Less than half a second later, Reneger collided into Mohney from behind, and fell on top of him. At that point, both players lost control and collided with the boards at the end of the rink. The entire duration of the accident was a little over two seconds.

The videotape demonstrates conclusively that the accident between Mohney and Reneger was just that—an accident. No reasonable jury could find Reneger to have acted recklessly or intentionally in colliding with Mohney. No reasonable jury could find Reneger to have acted recklessly or intentionally in failing to stop the slide in time to avoid a collision with the boards.

The parties dispute whether a penalty should have been called on the play. This Court is not qualified to determine whether a penalty should have been called or not. But even if a penalty should have been called on the collision, that is not sufficient to create a triable issue of fact as to whether Reneger's conduct was reckless or intentional.

Plaintiffs have argued that the factual dispute over whether a penalty should have been called on Reneger's action creates a triable issue of fact as to whether Reneger's conduct was willful and wanton, citing the case of *Bowen v. Kil–Kare* in support. In that case, Plaintiff Bowen had been a participant in a 200–lap automobile race at the Kil–Kare Speedway & Drag Strip. The rules of the race required that a red flag be used to signal drivers to stop racing in the event the racetrack became blocked or if an automobile was stopped in a hazardous position. Less than halfway through the race, with over an hour of racing to go, Bowen's car became disabled on the racetrack in a place where it was blocking the track in a hazardous position. Bowen signaled the flagman, but the flagman did not attempt to stop the race or otherwise to permit Bowen to remove himself and his automobile from the racetrack, in violation of the rules of the race and contrary to the normal practice at Kil-Kare Speedway. Bowen was hit by another car and was seriously injured. 585 N.E.2d at 386–87.

The Ohio Supreme Court reversed the trial court's grant of summary judgment in

the drag strip's favor on the ground that a triable issue of fact existed as to whether Bowen had signed an enforceable exculpatory agreement, but went on in *dicta* to state that the record evidence also created a triable issue of fact as to whether the drag strip's conduct in permitting the race to continue while Bowen sat stranded on the track constituted willful and wanton misconduct. 585 N.E.2d at 390.

*Bowen* is distinguishable from the case at bar. The difference between a flagman leaving a driver stranded on a busy racetrack for possibly over an hour and one hockey player colliding with another is obvious. First, racecar drivers do not enter races expecting to be stranded on active racetracks while other cars speed around them. Hockey players, on the other hand, anticipate that collisions with other players will occur on a regular basis. Second, in *Bowen*, the defendant drag strip had a significant amount of time in which to act to prevent Bowen's injury. In the case at bar, Reneger had little opportunity to avoid the collision. Finally, in *Bowen*, the defendant drag strip violated not only its own rules, but also the normal custom and practice of drag racing. In the case at bar, regardless of whether a penalty should have been called on the play, it is well known that ice hockey is a rough sport, and players regularly commit contact beyond that which is permitted by the rules. Penalty plays are an unfortunate part of the sport of ice hockey.

This case is not analogous to *Bowen*. Rather, it is analogous to the cases which have held that an injured ice hockey player is deemed to have assumed all of the risks that are usually incident to that game. *McKichan v. St. Louis Hockey Club, L.P.,* 967 S.W.2d 209 (Mo.Ct.App.1998); *Savino v. Robertson,* 273 Ill.App.3d 811, 210 Ill. Dec. 264, 652 N.E.2d 1240 (1995); *Gauvin v. Clark,* 404 Mass. 450, 537 N.E.2d 94 (1989).

Defendant Reneger did nothing more than to collide with another skater who suddenly appeared directly in his path of travel, at a distance of less than five feet, when Reneger was skating at top speed. His failure to avoid the collision cannot, as a matter of law, be deemed reckless or intentional on the evidence in the record.

Therefore, Reneger's motion for summary judgment must be granted.

### THE HOCKEY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

 The Hockey Defendants have moved for summary judgment on the ground that no reasonable jury could find them to have committed willful or wanton misconduct in connection with Mohney's injury.

Plaintiffs have identified no specific affirmative acts committed by any of the Hockey Defendants that would give rise to a finding of willful or wanton misconduct. They claim, however, that the Hockey Defendants knew about the increased risk of spinal injury posed by "touch icing" rules and failed adequately to warn players about that risk, and about how to minimize their chances of being injured, and that a reasonable jury could find that such failure constituted willful and wanton misconduct.

The Court disagrees. There is no evidence that any of the Hockey Defendants intended for Mohney to be injured. Nor did the Hockey Defendants fail to exercise any care whatsoever; it is undisputed that they provided warnings about the risk of spinal injury on the IMR form and maintained a twelve-foot space between the goal and the boards at the back of the rink, while ten feet was the standard. They also had published the results of a number of studies and prepared safety instructional materials. No reasonable jury could find that the Hockey Defendants' failure to do more amounted to willful and wanton misconduct.

Therefore, the Hockey Defendants' motion for summary judgment must be granted.

### THE MANUFACTURERS' MOTIONS FOR SUMMARY JUDGMENT

 Defendants Karhu and Bauer have moved separately for summary judg-

ment on the ground that no reasonable jury could find them to have committed willful or wanton misconduct in connection with Mohney's injury. Karhu and Bauer have submitted unrebutted affidavits and deposition testimony from numerous sources indicating that helmets and face masks are not designed to protect players from neck or spinal injury. The helmet Mohney was wearing at the time of the accident contained a warning in three places—on the helmet itself, on a hang tag attached to the helmet, and on the box containing the helmet—stating:

> Ice hockey is a collision sport which is dangerous. This helmet affords no protection for neck or spinal injury. Severe head, brain or spinal injuries, including paralysis or death, may occur despite using this helmet. Do not use this helmet if the shell is cracked or if the interior padding is deteriorated. Read instructions carefully before wearing.

It appears to be undisputed that there is no viable way to design a face mask and/or helmet to provide protection against spinal injuries while permitting hockey players sufficient freedom of movement to play the game effectively.

Plaintiffs have identified no specific affirmative acts committed by either Karhu or Bauer that would give rise to a finding of willful or wanton misconduct. Nor have they suggested any way in which the helmet and/or face mask could have been designed to protect against the injuries Mohney suffered. They claim, however, that when the clip holding the face mask broke off, Mohney's head rolled into a flexed position that exacerbated his injuries. They claim that a reasonable jury could find that the design of the helmet and face mask assembly constituted willful or wanton misconduct.

The Court disagrees. There is no evidence that either Karhu or Bauer intended for Mohney to be injured. All of the record evidence indicates that helmets and face masks are not designed to protect players from neck or spinal injury. Plaintiffs have not proposed any viable helmet or face mask design that would afford such protection. The helmet contained a warning informing players it did not afford protection from spinal injury. Even if Plaintiffs' claims arose under a theory of strict liability, it is highly unlikely that they would be able to survive a summary judgment motion on these facts. Where Plaintiffs' claims are premised on willful or wanton misconduct, those claims must fail absolutely. The helmet and face mask were not designed to protect against spinal injury. Karhu and Bauer cannot be held liable for willful or wanton misconduct based on the failure of their products to do something they were not designed to do.

Therefore, Karhu and Bauer's motions for summary judgment must be granted.

### PLAINTIFF'S MOTION TO COMPEL AND FOR SANCTIONS

On March 25, 1999, Plaintiffs filed a motion to compel and for sanctions against the Hockey Defendants on the ground that the Hockey Defendants had failed to cooperate with discovery.

The Federal Rules of Civil Procedure permit the Court to sanction a party for failure to comply with discovery requests. Fed.R.Civ.P. 37(b)(2). Before a motion to compel can be filed, the party seeking discovery must certify that it has engaged in informal attempts to resolve the discovery dispute, and that such attempts have failed. Fed.R.Civ.P. 37(a)(2)(B). The Local Rules for the Northern District of Ohio specify an additional prerequisite to the filing of a motion to compel:

> Discovery disputes shall be referred to a Judicial Officer only after counsel for the party seeking the disputed discovery has made, and certified to the Court the making of, sincere, good faith efforts to resolve such disputes. The Judicial Officer shall attempt to resolve the discovery dispute by telephone conference ...

Local Rule 37.1. A motion to compel may be filed only if the Court is unable to resolve the discovery dispute informally. *Id.*

In this case, Plaintiffs have certified that they engaged in good faith attempts to resolve their dispute as required by Fed. R.Civ.P. 37(a)(2)(B). They have not, however, asked the Court to assist in resolving their discovery dispute as required by the Local Rules. Discovery dispute conferences were held in this case on October 9, 1998 and December 9, 1998, but the Court's notes indicate that the subject matter of those discovery disputes was different from the subject matter of the motion at bar. Since Plaintiffs have not satisfied the prerequisites to filing a motion to compel and/or for sanctions, that motion must be denied.

### CONCLUSION

For the foregoing reasons, the motions for summary judgment of Defendant Jason Reneger (Doc. No. 37), Defendants USA Hockey, Inc., Toledo Cherokees Jr. Club, Inc., and Central States Hockey League (Doc. No. 41), Defendant Jofa Face Masks d/b/a Karhu USA, Inc. (Doc. No. 42), Defendant Cooper of Canada, Ltd. d/b/a Bauer, Inc. (Doc. No. 51) are granted.

The motions of Defendants USA Hockey, the Cherokees and CSHL to strike certain materials filed in support of Plaintiffs' opposition to their motion for summary judgment (Doc. Nos. 90 & 147) are granted in part and denied in part, as set forth previously in this memorandum opinion.

Plaintiffs' motion to compel and for sanctions (Doc. No. 138) is denied.

IT IS SO ORDERED.